Burke, J.
The complaint in this libel suit was dismissed at
the close of the plaintiff’s case, on the ground that plaintiff did not prove that libelous matter had been published of and concerning him. The Appellate Division unanimously affirmed. The appeal is before iis by leave of this court.
Plaintiff contends there was a question of fact which should have been submitted to the jury concerning alleged defamatory and alleged untrue statements referring to the plaintiff, con *4 tained in a book of 213 pages entitled “ Red Channels ”, published in 1950.
The complaint alleges that the publication was intended to, and did, convey to the public that the plaintiff, an actor, was either a Communist dupe, tool, sucker, part of a transmission belt, fellow-traveler, or a “red channel”, all of which was false and malicious and held the plaintiff up to public ridicule and contempt, and prejudiced his opportunities to earn a living. The amended answer generally denies the allegations except publication, specifically denies malice and damage, and pleads truth and fair comment as complete defenses.
The text of the book is divided into three sections, Part I, an introduction, Part II, an alphabetical index of 151 names, and Part III, an alphabetical index of organizations.
The reference in the book to the plaintiff is at page 90 and reads:
“Joe Julian Reported as:
Actor — Radio
Artists ’ Front to Win the War
Speaker. Meeting, 10/16/42. House Un-Am. Act. Com., Appendix 9, p. 575
National Council of the Arts, Sciences and Professions
Attended meeting to abolish House Un-American Activities Committee, Hotel Commodore, NYC, 1/9/49. NY Jour nal-American, 12/30/48.”
The charge is made that this reference when read in connection with the title cover and an introduction of about 1,500 words contained in the first eight pages of the book, creates the impression that plaintiff was a Communist, or sympathizer, dupe, tool, sucker or part of a transmission belt, fellow-traveler or a “ red channel ’ ’. The selected words and phrases taken out of their context by plaintiff and massed in the pleading are used in different concepts. The meaning of the words and phrases, when read in context, is quite different.
*5 The introduction states in substance that the Communists seek to exploit radio and television in order to insure procommunist propaganda, financial support, and the appearance of television and radio personalities at Communist front meetings so as to exercise a strong influence over American broadcasting and telecasting. In this effort, the authors say, skilled and talented citizens are denied employment, while procommunists, their personal friends and performers at Communist front meetings, are not only employed but “boosted” to stardom. In turn these successful performers are called upon for contributions and more frequent appearances at meetings as their prestige with the public increases — all for the greater good of the Communist cause. These efforts, innocent or not, it is opined, result in an infiltration into and dominating influence over two of the most effective propaganda instrumentalities of this era.
The critics of this alleged policy are, of course, entitled to be heard. However, if the publication is libelous and indefensible, it is actionable.
Since there are at least 10 candidates for each job in television and radio, the described secret discrimination, if it exists, is the rankest type of bigotry and intolerance. It violates the rights of the skilled and talented citizens seeking positions in the business, and also the right of the public to know that the people who enter their homes over the radio, and on the television screens, truly represent the American People. The public interest is manifest, as the airways belong to the public not to the performers, not to the sponsors, not to the advertising agencies, not to the stations, not to the networks, and not to the government. There are 52,000,000 radio homes and 135,000,000 radio sets and 38,000,000 television sets in this country.[1] Television and radio stations are controlled by the government in other countries. In this country they are generally privately owned and operated. Publishers have the right to inform the public about the people in an industry of communication which reaches into every home in this country and many homes abroad. Sueh information necessarily must be based on facts from which reasonable inferences may be drawn.
The preface to Part II of the alphabetical index of names states the purpose in listing the names. It reads: “ The infor *6 mation set forth in the following report is taken from records available to the public. The purpose of this compilation is threefold. One, to show how the Communists have been able to carry out their plan of infiltration of the radio and television industry. Two, to indicate the extent to which many prominent actors and artists have been inveigled to lend their names, according to these public records, to organisations espousing Communists causes. This, regardless of whether they actually believe in, sympathise with, or even recognise the cause advanced. Three, to discourage actors and artists from naively lending their names to Communist organizations or causes in the future.” (Emphasis added.)
The plaintiff conceded that he had attended the meetings, and that the two organizations were properly characterized as Communist fronts. As to the introduction, the supplemental bill of particulars of the plaintiff states: “in general, the picture of the Communists and what they stand for and the endeavor of Communists to infiltrate into the radio and television fields would not be questioned by us, and we agree that you don’t have to prove this ”.
Defendants argue that the truth of the above facts being undisputed, the book and the evidence establish the defense of fair comment as well as the insufficiency of the complaint.
The introduction and purpose statement of Part II mentions “innocents”, “well-intentioned liberals”, persons who “ advance Communist objectives with complete unconsciousness ”, “ genuine liberals ”, “ actors and artists have been inveigled to lend their names * # * whether they actually believe in, sympathize with, or even recognize the cause advanced ”, in addition to “ Communist ”, “ fellow traveler ”, or “ part of a transmission belt ”. There is no allusion in the book, containing 151 names, to indicate in which, if any, of the categories the plaintiff belongs. It does show he was not in the category of a member of the Communist party.
The Communist attempts to infiltrate American life are matters, needless to say, of the deepest and broadest concern.
In this State and this country, every citizen has a constitutional right to free speech. The law of libel is a limitation on the -right of every citizen to write freely. Just as the constitutional right of free speech must be extended to all our citizens equally and without discrimination, so also the *7 limitations must be based upon a rule or doctrine which does not create a preference or discrimination in favor of or against any citizen or group of citizens. We may not brush aside constitutional rights by setting up a double standard for comment. Any invasion of the freedom of the press justifies a concern about the inviolability of that great right.
In furtherance of the preservation of the right to write freely, the law of libel recognizes fair comment as a complete defense to a charge of a libelous publication. The comment must be fair. It must be a reasonable inference from facts truly stated. The basis of the right of comment is a public thing or act. We know from experience that political subjects are always controversial. They elicit divergent opinions. The same act may be greeted with praise, indifference or denunciation. The protection of political comment which has been written because the circumstances are of public interest, is indispensable to the exercise of freedom. This right every citizen possesses as a citizen. It is not merely a privilege. Editors, actors, writers, teachers and lawyers enjoy no higher right. The constitutions guarantee a right to all citizens to criticise the government and governmental bodies. The defenders of the activities of government have an equal right to criticise the critics. Criticism in political debates is biased, unkind and hostile, but nevertheless, not actionable.
In this case there is more than proof of the usual political activity. There is an admission that the plaintiff appeared at two Communist front meetings and a concession by the plaintiff that the Communists are attempting to infiltrate television and radio.
The plaintiff, an actor in the radio and television industry, a major medium in the shaping of public opinion, performed a public act in appearing and reciting at the meetings organized by Communist fronts. With frequent access to the radio and television audience, actors, writers, directors and producers can and do mold the thinking of our citizens to a degree far greater than our leaders in political, economic, philosophic or religious life, who cannot afford to or do not utilize these media extensively.
With these circumstances in mind, even if defamatory matter could be deemed to have been published of and concerning the plaintiff, we nevertheless hold that the defense of fair comment *8 is complete as a matter of law. If the public figure’s political activities at sponsored Communist front rallies cannot be criticized, and his presence on radio or television cannot be challenged as being opposed to the national interest, then there is no field of fair comment.
* ‘ Like all other questions, whether comment is a complete defense may so appear from the plaintiff’s pleadings or on the trial so as to warrant a court in deciding its sufficiency as a matter of law ” (Seelman on Libel and Slander, Ch. XIII, par. 246; Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers, 260 N. Y. 106; Hall v. Binghamton Press Co., 263 App. Div. 403, affd. 296 N. Y. 714).
The plaintiff has admitted, as true, what is said in the introduction of the book concerning the interest of the Communists in the television and radio industries, what they stand for and their endeavors to infiltrate radio and television.
The plaintiff has conceded that he attended the Communist front meetings as reported in the book, and that the two organizations were properly characterized as Communist fronts. The introduction states that an individual, lending his name and presence to such activities, does this knowingly or unknowingly. The introduction concludes that in its opinion in both cases the resulting injury to the public is the same, for in each case a publicized name or person has been used to promote the purpose of communism. Such an inference from admittedly true facts is not only reasonable but ineluctable, and one in accord with the plaintiff’s own statement as to the purposes of Communists in radio and television.
We have held that even in the absence of admission as to the truth of the facts, it is sufficient if the facts form a reasonable basis for inference and the comment connected with the facts. “ A comment is fair when it is based on facts truly stated and free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticized, and is an honest expression of the writer’s real opinion or belief. ’ ’ (Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers, 260 N. Y. 106, 118, supra [tax dodging]; Hall v. Binghamton Press Co., 263 App. Div. 403, affd. 296 N. Y. 714, supra [friend of fifth columnists].) Under the rule of fair comment even if the publication holds one up to public ridicule, contempt and reproach or prejudices one in his opportunity to earn a living, *9 nevertheless it is not actionable if facts form a reasonable basis of inference. This rule has been the law for many years where people treasure freedom of speech and resent arguments which would curtail it by granting protection from comment to particular public figures. “ So whenever a man calls public attention to his own grievances or those of his class, whether by letter in a newspaper, by speeches at public meetings, or by the publication of pamphlets, he must expect to have his assertions challenged, the existence of his grievances denied, and himself ridiculed and denounced. Odger v. Mortimer, 28 L. T. 472; Koenig v. Ritchie, 3 F. & F. 413; R. v. Veley, 4 F. & F. 1117; O’Donoghue v. Hussey, Ir. R., 5 C. L. 124; Dwyer v. Esmond, 2 L. R. Ir. 243.” (Newell on Slander and Libel [4th ed.], p. 545.)
Assuming that we could construe the introduction to express beliefs that the plaintiff by engaging in political activities in company with Communist front organizations thereby was disqualified for employment in radio or television, they are, nevertheless, merely assertions of opinion and not assertions of fact. Sentiments are divided. The four major networks and individual employers obviously did not share such an opinion as they continued to employ the plaintiff. They used their own judgment as to the impact of the plaintiff’s political activities and Communist front associations upon his availability as an actor.
The public has a right to know if the public or the people seeking their patronage in a public field are being victimized. (Oma v. Hillman Periodicals, 281 App. Div. 240 [boxer].)
Unless the person is falsely accused of wrongdoing, he or she must accept the criticism or comment. The publisher’s right to comment is protected and is not actionable, if reasonable (Hall v. Binghamton Press, 263 App. Div. 403, affd. 296 N. Y. 714, supra [quisling]; Foley v. Press Pub. Co., 226 App. Div. 535 [a “ fixer ”]).
The public always must be given the opportunity to make its own decision. To this end the right to speak and write freely in regard to public personalities has always been defended as long as the right is exercised openly and reasonably. In this way the public can judge those reporting, as well as those reported. The clandestine work of bigotry and intolerance flourishes when comment is suppressed. Those who seek public *10 acclaim and support cannot expect immunity from criticism or insist that the public remain uninformed regarding their activities. The conduct of public figures is legitimate matter of investigation. Those who demand the right of free speech as necessary to the successful pursuit of their profession, should not seek to deny the same right to their critics. To hold that this book, in the light of the admissions made by the plaintiff, is defamatory, is to expand the law of libel so as to violate the constitutional guarantee of free speech. (U. S. Const., 1st Arndt.; N. Y. Const., art. I, § 8.) We may not by judicial rule so confine and fetter public discussion.
Free speech is not the sole property of special classes of our people, such as radical or liberal dissenters, or opponents of censorship. Every person has the right of free speech, even the moderate, the conservative dissenter and the prude. The plaintiff had the rights of assembly, of petition, and the exercise of free speech in attending a Communist front meeting organized to set in motion measures designed to abolish the House Un-American Activities Committee, and to call for a second front in Europe in October, 1942, after our entry into World War II and while we were under intense attack by the Japanese, although the government’s domestic and foreign policies were otherwise. To the same extent his fellow citizens have a right to show who organized the meetings, why in their opinion they organized the meetings, and whether the meetings were part of a plan, and what standing the organizers of the meetings have in the community and whether in their opinion it impaired his qualification for employment in an industry disseminating news and ideas.
The plaintiff insists on an immunity which would enable him to draw a curtain about the influences of his political activities at Communist, meetings, while he is permitted to attack in company with the Communist fronts the policies of the government. To assert such a right is to assert a right that the public must remain uninformed regarding activities concerning which the public share divided opinions. When citizens take part in political meetings organized by Communist fronts and giving rise to conflicting opinions among our citizens, they expose themselves to the chance of comment as do all other public figures. The sum of the plaintiff’s argument is that comment is actionable if it is directed at any one who, though not a Communist, associates with Communist fronts. Associating with *11 Communist fronts, in other words, coupled with comments thereon, creates a prima facie indefensible case of libel. Such a rule would establish a privileged class of citizen and would be wholly un-American.
Safeguarding and protecting the individual liberty of freedom of speech for all is for the general good, though it may work a private injury. The injury in one’s trade or occupation can be equally as severe to a conservative, moderate or prude when attention is called to their activities, as well as to the radical, liberal and opponent of censorship. Comment, if the question is of foreign and domestic policy, is a right to be exercised by all equally. The courts may not construct a shelter from comment for those persons who lend their prestige and presence to groups or persons believed to be working against the national interest. Critical comment is a penalty one must accept whether radical or conservative, liberal or moderate, prude or opponent of censorship, when they involve themselves in political activities.
To characterize the plaintiff’s political activities at Communist front meetings as an impediment to employment in radio and television is not to determine his professional fitness for employment; it is mere opinion. We may not resort to fine and shaded distinctions and words may not be pressed out of their ordinary usage to sustain a charge of libel. A libel suit may not be used to intimidate public opinion or restrict freedom of thought. Dissenters may and do lawfully challenge an opponent’s right to specific employment. In a country with a population of 160,000,000 people, all citizens have a right to compete for employment in a communications industry where the public is and should be the final arbiter as to the standing of the people who speak to them on radio and appear in their homes. Hence publie debate should be encouraged, not stifled. The debate must be on facts secured from revealed sources and identified informers. The criticized must always know who their critics are, and from whom the information was secured.
The statements in the book do not reflect any disparagement of the professional skill or ability of any individual in his trade or business. On the contrary, they leave the impression that the people named are talented and popular in their profession and with the public. Indeed, the argument is made that it is because of that popularity that they wittingly or unwittingly aid the cause of communism. An opinion based on a true report *12 that public figures attended Communist front meetings, and that such acts benefit the Communist cause and are against the national interest, cannot raise a presumption of malice or be found to be wanton or reckless. The admitted conduct of the individuals may be so characterized but not the comment upon it. The comment does not attack anyone’s private character. The criticism is of the acts of the individuals. No actual malice can be implied nor has any actual malice been proven. The introduction cautions the reader: “In screening personnel every safeguard must be used to protect innocents and genuine liberals from being unjustly labelled.” The comments were based on documentary reports and books. Proof that the reporters are in a profit-making venture is not proof of malice. Newspapers and magazines are profit-making ventures. Comment is not reserved for the wealthy who can afford to subsidize criticism — the poor and middle class have equal rights. In Hoeppner v. Dunkirk Print. Co. (254 N. Y. 95) we ruled that the burden is upon the plaintiff to prove malice. The plaintiff here failed prima facie to prove actual ill will, malice or culpable recklessness or negligence. (Hamilton v. Eno, 81 N. Y. 116, 127; Cherry v. Des Moines Leader, 114 Iowa 298; Gott v. Pulsifer, 122 Mass. 235.)
The precedents suggesting that the questions of fair comment and of malice in some cases are for the jury had a local community factual pattern. They did not embrace within the factual pattern a political ideological subject matter of national and world-wide interest and a person employed in propaganda media with audiences measured in the tens of millions. Such cases are not analogous. In Triggs v. Sun Print. & Pub. Assn. (179 N. Y. 144, 154) the court said: “ When a publisher goes beyond the limits of fair criticism, his language passes into the region of libel, and the question whether those limits have been transcended may become a question of law but ordinarily presents a question for the jury ”.
In that case and in Pecue v. West (233 N. Y. 316), Foley v. Press Pub. Co. (226 App. Div. 535, supra), and Hoeppner v. Dunkirk Print. Co. (254 N. Y. 95, 106, supra), the plaintiffs did not indulge in attacks on the foreign and domestic policy of the government. There the plaintiffs were going about their own affairs seeking no quarrel and the published matter concerned an incident occurring in the usual course of their own way of life. The publishers intruded, not the plaintiffs. The *13 facts here are not ordinary, they are extraordinary. The plaintiff, exercising his right of free speech, thrust himself into a controversy regarding a national and international subject — communism — and a seething national issue — the activities of the House Un-American Activities Committee. By entering in association with Communist fronts, into a debate which was then raging and continues to rage at a national level, involving the judgment of our national House of Representatives, plaintiff, as an actor employed on the radio and television networks, can hardly charge the defenders of the House Un-American Activities Committee and the enemies of Communist fronts with malice or negligence or recklessness or unfair comment, when they object to his admitted conduct in appearing with their opponents and question his fitness for employment on a propaganda media. In this setting we in New York may not throttle free speech and comment in such a way as to determine what the public of the other 47 States and the territories are entitled to know about these controversial subjects. This would effectuate a censorship which would be violative of the fundamental principles of freedom of the press which includes the public’s right to be informed of the actions of the opponents and defenders of our government and governmental agencies. Long ago we learned that it is easier to control thought if one begins by controlling the press. It is evident that an ability to exercise control over television and radio free from comment would be even more desirable. We may not permit even a chance of a denial of the right of the public of the United States to know who the critics and the criticized are in a national debate on the uses and abuses of propaganda and propaganda instrumentalities.
Evidence of an admission made by one of the defendants after publication that the book was not perfect in respect to repeating the caution against quick judgments is not enough to create a question of fact as to recklessness or negligence when there is a clear warning, when a plaintiff admits he was present at the Communist front meetings, when the book singles out the members of the Communist party, and when plaintiff concedes the Communists are attempting to infiltrate radio and television.
The plaintiff voluntarily engaged in political controversies in company with Communist fronts on matters affected with a public interest and outside of his trade or business. The comment was on admittedly true, pertinent facts and was a reasonable inference. Any injury occurs not from criticism of the *14 person in Ms discharge of Ms employment duties, but from criticism of his actions at Communist front meetings. Such comment cannot be considered personal — the plaintiff put himself in the way of the critics. There was no question of fair comment involved in Mencher v. Chesley (297 N. Y. 94, 101). Since the complaint, and the bills of particulars, and the book prove the statements to be proper comment, even if libelous, the complaint was properly dismissed.
Without passing on the defense of fair comment, the trial court and the Appellate Division have found that the book is not libelous. They held that the charge of the plaintiff that the book is defamatory in that it exposed him to contempt and aversion and touched him in the way of his office or trade, is unsubstantiated. To date six Justices of the Supreme Court of this State have read the book carefully and have decided that there was no defamatory matter published of and concerning the plaintiff. The court below applied the rule in Hays v. American Defense Soc. (252 N. Y. 266, 274-276). In that suit, in dismissing the complaint, we said:
“ the charge made in the pamphlet is no more than that certain of the directors of the organization to which he belongs and of other organizations are Reds or Radicals. It further charges that certain of the persons interested in these various orgamzations are adepts and certain are dupes, and that the dupes are being used by being placed actively to work furthering some idea which if put into practice would contribute to the general purpose of the Communists. This is far from charging the plaintiff specifically with being an adept ora dupe. ’ ’ (Italics added.)
“No one, from a reading of the article, would be justified in saying that it charges that the plaintiff is a radical, a Red, engaged in an attempt to overthrow the government, or in any conduct which holds him up to scorn or ridicule. The allegations of the complaint which so charge are limited by the article itself, which is made a part of the complaint. It contains no language which constitutes a libel against the plaintiff.”
It is for the court to decide whether a publication is capable of the mearnng ascribed to it. The ‘ ‘ court shirks its duty if it creates an issue, when none exists ” (Crane v. New York World Tel. Corp., 308 N. Y. 470, 479-480). The book must be read as a whole. The words and phrases must be construed together With their context. (Seelman, Law of Libel and Slander in *15 New York, par. 160, p. 138.) The interpretation placed by plaintiff upon the title and statements in the introduction is unwarranted. Judge Gray in Crashley v. Press Pub. Co. (179 N. Y. 27, 34) said: “ I do not think that to attach his name to the coterie, which surrounded him, was to impute to him their personal defects, or moral turpitude.” In this case the courts below reached the same conclusion.
The rules in More v. Bennett (48 N. Y. 472, 476), Sidney v. Macfadden Newspaper Pub. Corp. (242 N. Y. 208), and Cafferty v. Southern Tier Pub. Co. (226 N. Y. 87, 622) were framed to aid in determining whether or not published statements were libelous, not to assist in determining whether a statement applies to the individual. In those cases it was clear that the writings were published of and concerning the plaintiffs. The use of such authorities by a process of extrapolation is not permissible here as the primary issue in this case is entirely different. We must first determine whether the alleged libelous matter was published of or concerning the plaintiff.
In the Hays case (252 N. Y. 266, supra) this court laid down the rule as to fair reading in order to determine whether the writings applied to a plaintiff.
The defendants published a pamphlet entitled ‘ ‘ LaFolletteSocialism-Communism ”. The Appellate Division speaking of the introduction said: “It stated in substance that the Communists claim that the realization of socialism is the first step toward a Communist commonwealth; that the Workers Party of America was operating in sympathy with Communist organizations teaching the destruction of government, and was for that purpose advocating the election of those holding socialistic views. The pamphlet continues to emphasize the general trend of all so-called liberal movements to absolute revolutionary anarchism, to strikes, rioting, violence, sabotage, etc. The pamphlet states that ‘ the destructive radicals launched into the political life of the country with a greater determination than ever before to effect the overthrow of the United States Government by force and violence, as demanded by the Communist leaders of Soviet Russia. ’ It continues: ‘ This movement, the leaders of which will have no part in any attempt at reform, but insist upon destruction, is constantly attaining greater and more menacing strength through a system of interlocking directorates whereby a comparatively small number of individuals are able to shape the policies of various organizations *16 and quickly or gradually turn them to the advantage of the world revolutionists.’ The pamphlet then mentions certain grQups of affiliated organizations 1 which clearly understand the line of march on which they are moving deliberately toward world revolution. ’ It refers again to the system of interlocking directorates of these organizations. It announces that ‘ the best way to discover “useful workers” and “skilled leadership ” in the well-articulated associations, societies and leagues which relate themselves to revolutionaries indirectly by interest in similar activities is to observe the cross-beam directorates. (See chart of directorates.) ’ ” (224 App. Div. 588, 589.)
The pamphlet contained an “ Index to Directorates ” in which plaintiff’s name was listed and an “ Index to Organizations ” in which the organizations to which plaintiff belonged were listed.
This court decided that a fair and careful reading would be required. We ruled that, in order to state a cause of action, the alleged libelous article must refer to the plaintiff and concluded that, if it found that the alleged libel was not of and concerning plaintiff, the complaint should be dismissed. The court found, as here, that nowhere in haec verba was plaintiff called a member of the Communist party, or a Red, or a criminal, or engaged in a movement to overthrow the government, or any of “ the things set forth in the innuendo ”. The court noted that, on the other hand, the pamphlet made clear that: “ ‘ Beyond question many of the members of the organizations shackled by the interlocking directorates have no appreciation of their destination. Many of the organizations were doubtless founded by people actuated by feeling a real need for improved conditions or by humanitarian impulses.’ It does not state whether the plaintiff is a person ‘ actuated by feeling a real need for improved conditions or by humanitarian impulses ’ or otherwise.”
The court then ruled upon the precise issue involved in the instant case. We assumed that plaintiff was a director of the organizations to which he admitted he belonged. Yet we held that plaintiff was not libeled. This case and the jRays case (supra) are indistinguishable. The purpose of both books was to prevent the growth of radical doctrines in this country. In the present publication there is exculpatory material and warnings against misjudging the people listed. In that respect the *17 authors here showed greater care than the authors of the LaFollette pamphlet.
It is essential in making out a prima facie case in libel to prove that the matter is published of and concerning the plaintiff. The book itself fails to reveal any connection between any of the alleged defamatory matter and the plaintiff. The claim that the title “Red Channels” applies to the plaintiff raises no triable issue, because it is clear that the title refers solely to organizations and devices for the spreading of Communist propaganda and not to individuals.
The listing of attendance of Julian at only two meetings widely separated, the first in 1942 and the second in 1949, in itself does not support the plaintiff’s charge that it was the intention of the book to cast him as a “ sympathizer ”, “ dupe ”, “ tool ” or “ sucker ”, “ colonist ” or other so-called objectionable terms. His participation at Communist front meetings fell far short of that activity necessary to be classified as a “sympathizer”, “dupe”, “tool”, “sucker” or “fellow-traveler ”. The terms “ dupe ”, “ sucker ”, “ sympathizer ”, “ tool ” or “ fellow-traveler ” and other so-called objectionable terms as used in this book clearly connote a regular and continuous use of the presence and talents of an individual. The references to plaintiff, when read together with the introduction and purpose statement of Part II, are not susceptible of a libelous interpretation. The statements are clear and unambiguous and consequently cannot be enlarged upon or changed from the sense in which they were used.
The plaintiff, who has the affirmative burden of proving the alleged libelous material was published of and concerning him, would have us relieve him of the burden without evidence.
To so rule would be the equivalent of establishing the doctrine that proof may be dispensed with in certain libel suits, and a trial rendered unnecessary by requiring a submission of all publications to juries to determine all issues.
We declared in Moore v. Francis (121 N. Y. 199, 202-203): “ It is the settled law of this state that in a civil action for libel, where the publication is admitted and the words are unambiguous and admit of but one sense, the question of libel or no libel is one of law which the court must decide. (Snyder v. Andrews, 6 Barb. 43; Matthews v. Beach, 5 Sandf. 256; Hunt v. Bennett, 19 N. Y. 173; Lewis v. Chapman, 16 id. 369; Kingsbury v. Bradstreet Co., 116 id. 211.) ” *18 The indispensable proof is lacking. The alleged libelous material upon a fair reading and evaluation has not been shown to have been published of and concerning the plaintiff and consequently the complaint was properly dismissed, as the complaint did not state a cause of action (Corr v. Sun Print. & Pub. Assn., 177 N. Y. 131; Hays v. American Defense Soc., 252 N. Y. 266, supra).
Mencher v. Chesley (297 N. Y. 94, supra) is inapposite. There the prime question for decision was whether it was libelous to characterize one as a Communist or Communist sympathizer when it was proven that the statements “ former Daily Worker employee ”, “ campaign manager for * # * Communist candidate ” were directly published of and concerning the plaintiff. In the cases cited in the dissenting opinion the defamatory matter was shown to be directly published of and concerning the plaintiffs. (Brown v. Tregoe, 236 N. Y. 497 [creditman]; Moore v. Francis, 121 N. Y. 199, supra [a bank teller]; Hoeppner v. Dunkirk Print. Co., 254 N. Y. 95, supra [football coach]; Krug v. Pitass, 162 N. Y. 154 [doctor]; Kleeberg v. Sipser, 265 N. Y. 87 [attorney]; Ben-Oliel v. Press Pub. Co., 251 N. Y. 250 [lecturer]; Bornmann v. Star Co., 174 N. Y. 212 [doctor].)
In all those cases the defamatory matter and the plaintiffs were linked together by a chain of unchallenged proof. For this reason they cannot be adverted to as precedents.
Having determined after a reading of the book that nothing defamatory was published of or concerning the plaintiff, it is unnecessary to discuss at length the evidence extrinsic to the book offered by the plaintiff under the authority of Bishop v. New York Times Co. (233 N. Y. 446, 451, 454) to show that he was avoided and shunned by former friends and acquaintances “ as the direct and well-connected result of the libel.” Such evidence is admissible only to support the ‘ ‘ presumption of injury to reputation and mental distress ” and as “ tending * # * to prove such consequences ”. Without proof that a libel was published of and concerning plaintiff, there is no presumption of damages.
The evidence offered by the plaintiff is more than inconclusive, it is contradictory of and renders nugatory the averment in the complaint that he was shunned and avoided which plaintiff attempted to prove though not required by any rule of law.
*19 The testimony of a producer-director that “ We quarantine everybody in the book. We cannot take any chances ” was recanted and was contradicted by the testimony of the plaintiff and the testimony of other witnesses for the plaintiff. The testimony shows that the plaintiff’s reputation as an actor at the time of the trial was “good”. Three witnesses admitted they could not say he had been shunned or avoided. One of his employers testified that he hired the plaintiff on two separate occasions after the publication of the book.- The plaintiff testified he was retained on a radio show after the employer had read the book. After the publication of the book, plaintiff appeared on four television programs as against two programs prior to its publication. In 1950, 1951, 1952, 1953 and 1954, the plaintiff appeared on all four major networks. Moreover, a number of the actors, actresses and writers listed in the book then were, continued to be and are nationally and internationally known and well employed.
The direct questions put to a witness, Francis, having been objected to, were improper, and the answers inadmissible as they sought the witness’ opinion that the publication attacked the plaintiff (Van Vechten v. Hopkins, 5 Johns. 211, 225, 226). The testimony of Francis, who admitted he had not carefully read the book, did not in any way tend “ to prove plaintiff had been shunned and avoided by former friends and acquaintances as the direct well-connected result of the libel ”. It did not meet the standards laid down in the Bishop case (233 N. Y. 446, supra). Linehan v. Nelson (197 N. Y. 482) cannot be relied upon by the plaintiff as an authority to support the argument that the testimony of his own witness that he was unharmed may not be considered because the plaintiff here did not take appropriate objections at the trial so as to preserve the question for appeal. Furthermore, such responses were made to questions propounded by the attorney for the plaintiff on the direct examination.
We find the criticism, based upon public policy, is fair and honest, promoted the public good and enabled the people to form an estimate of the critics as well as the criticized.
The determination of the Appellate Division and the trial court, unanimously pronounced, after a reading of the publication, that nothing defamatory was published of and concerning the plaintiff, should be affirmed.

. The World Almanac, 1956, p. 790.