Albert A. CARDONE, Plaintiff,

v.

EMPIRE BLUE CROSS AND BLUE SHIELD, Harry C. Barrett, Phillip Briggs, John R. Gunn, Theresa A. Infantino, William T. Lee, Robert O. Lehrman, Wesley R. Liebtag, Edward J. Malloy, John McGillicuddy, Michael S. Modell, Hugo Monnig, Jr., Robert O'Brien, Frederick Wilkinson, Robert D. Wilson, Harold Wolchok, John Zuccotti, Harold E. Vogt, Whitman Breed Abbott & Morgan, Salvatore R. Curiale, Individually and as Superintendent of the New York State Department of Insurance and John Does Nos. 1–20, Defendants.

No. 94 Civ. 4368 (HB).

United States District Court, S.D. New York.

April 20, 1995.

Oppenheimer Wolff & Donnelly, New York City (Christopher W. Jones, Herbert C. Ross, Jr., Allison F. Blackwell, of counsel), for plaintiff.

Weil, Gotshal & Manges, New York City (Otto G. Obermaier, Mark A. Jacoby, Jonathan S. Greenberg, Lawrence J. Baer, Peter A. Antonucci, Linda R. Daly, of counsel), for defendants Empire Blue Cross and Blue Shield, Philip Briggs, John R. Gunn, Theresa C. Infantino, William T. Lee, Robert O. Lehrman, Wesley R. Liebtag, Edward T. Malloy, John McGillicuddy, Michael S. Modell, Robert O'Brien, Frederick Wilkinson, Harold Wolchok and John Zuccotti.

Patterson, Belknap, Webb & Tyler, New York City (Harold R. Tyler, Jr., Robert D. Wilson, Jr., of counsel), for defendants Hugo Monnig, Jr. and Robert D. Wilson.

Gordon Marshall, New York City (Jack S. Hoffinger, Vivian Berger, of counsel), for defendant Harold E. Vogt.

G. Oliver Koppel, Atty. Gen. of State of N.Y., New York City (Jane Lauer Barker, M. Patricia Smith, of counsel), for defendant Salvatore R. Curiale, Superintendent of New York State Dept. of Ins.

### OPINION AND ORDER

BAER, District Judge.

This case arises from a 1993 public debate over the financial condition of New York's major non-profit health insurance provider. The claims of plaintiff Albert A. Cardone grow out of his precipitous and not entirely voluntary resignation as Chairman and Chief Executive Officer of Empire Blue Cross and Blue Shield in May 1993. A year later, Cardone sued Empire and sixteen of its current and former Directors ("Empire"), the New York Superintendent of Insurance Salvatore R. Curiale ("Curiale"), the law firm of Whitman, Breed, Abbott & Morgan, and John Does Numbers 1–20. The complaint contains twelve claims for relief regarding an eight-year relationship between Empire and Cardone. Excluding Cardone's claim against the law firm which is not contested here, the claims fall into three categories:

(1) Empire's alleged failure to abide by agreements to pay Cardone severance and other benefits;

(2) Curiale and Empire's alleged civil rights violations under 42 U.S.C. § 1983;

(3) Empire and Vogt's alleged defamation, "false light," and *prima facie* torts involving statements to the press.

Cardone moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on Claims 1, 2, 4, 5, and 11. Empire cross-moved on Claims 1–11. Harold E. Vogt, who succeeded Cardone as Chairman of the Board, cross-moved against Claims 8, 9, and 10. Two other Board members, Hugo Monnig, Jr. and Robert D. Wilson oppose Cardone's motion, and join the other defendants' cross motions against Claims 2, 3, 8, 9, 10, and 11. Curiale cross-moved against Claim 11. For the reasons stated below, all but one of Cardone's claims at issue here must be dismissed.

### THE FACTS

#### A. Background

In mid-May 1993, Empire was an insurance giant in trouble. Its capital had shrunk by $250,000,000 over the preceding two years. The national Blue Cross association had threatened to remove its affiliation. Empire had become the target of a U.S. Senate investigation for alleged mismanagement. And a state legislative report had asserted that Empire risked insolvency if it did not make "wholesale" changes in its operation. Vogt Affidavit ("Vogt Aff."), Ex. 1.

Much criticism focused on Cardone, then CEO and Chairman of the Board. Viewed by some as "confrontational and autocratic" as well as extravagant, he was also accused of having withheld key information from the Board. *Id.* ¶ 9; Ex. 2. On May 20, 1993, the Board announced its acceptance of Cardone's resignation, the election of Harold E. Vogt as interim Chairman, and the designation of a senior executive, Donald L. Morchower, as acting CEO. *Id.*, ¶¶ 3, 10; Exs. 2, 3, 10. Vogt remained Chairman until July 1, 1993. In his last full year, Empire paid Cardone over $660,000. Cardone Affidavit ("Cardone Aff."), ¶ 22. Most disquieting is my understanding that despite broad-based criticism of Cardone, extravagant compensation packages seem to have taken on a life of their own at Empire Blue Cross and Blue Shield.

## B. The Tort Claims

Empire's problems worsened when, in early June 1993, a *New York Times* reporter confronted Vogt with the charge that Empire's internal financial reports differed from those filed with the New York State Insurance Department. According to the *Times,* the relevant material had been sent to the paper anonymously. Vogt Aff. ¶ 12; Ex. 8. Vogt asked Maroa Velez, Vice President of Empire's Audit Division, "to look into the matter." *Id.* ¶¶ 13–14; Exs. 5, 8. On June 16, 1993, Velez informed Vogt that "unsubstantiated differences" in the numbers had been "confirmed." *Id.* ¶¶ 15–17 & n. 2; Ex. 5.

On the same date, Empire issued a news release in which Vogt declared "that the Company's internal auditors today uncovered a discrepancy in a Schedule filed with the Superintendent of Insurance reporting on market segment performance for the years 1989, 1990 and 1991." The release did not mention Cardone. It recounted that Vogt had initiated the inquiry leading to this discovery and quoted him as saying that Empire had hired a law firm "to perform a thorough investigation of the matter ... pending the outcome of [which] the Company could not speculate on the extent of involvement of any current or former employee." *Id.* ¶ 19; Ex. 6.

On June 17, 1993, the *Times* ran a story on the subject. Referring to the anonymous data it had received and its request that Vogt provide an explanation, it stated, without specific attribution: "Empire ... acknowledged yesterday that the company had repeatedly sent erroneous data to New York State insurance regulators." The article quoted Vogt as saying: "It appears there was some discrepancy and it appears that we needed to address it." The article did not mention Cardone as the responsible employee. Rather, it cited the assertion in the June 16th news release to the effect that Empire would not speculate on the extent of any individual's involvement. It did, however, quote Vogt as saying that the regulators wanted to question Jerry Weissman, then Chief Financial Officer, regarding certain "missing data." Vogt Aff. ¶¶ 20–22; Ex. 8.

Continuing the story on June 18, 1993, the *Times* used the phrase "false financial data" to describe the submissions to the New York State Insurance Department. According to the article, unnamed Empire officials stated they "misled state legislators" the year before "by using the data to help secure a major rescue plan for the company." The *Times* further reported that Vogt had "said an investigation was under way" and that "inaccurate information may have been given to legislators." The story quoted Vogt as stating: " 'I'm concerned that it was misleading,' " and thereafter recounted Vogt's comment "that he was 'gravely concerned' that laws may have been broken." *Id.* ¶¶ 23–24; Ex. 9. That same day, Empire issued a news release stating that "Vogt announced that the Audit Committee of the Board will immediately assume jurisdiction over the investigation now underway of the discrepancies in data reported in earlier years by Empire to the New York State Department of Insurance." The release did not mention Cardone. *Id.* ¶ 27; Ex. 10.

## C. The Benefits Claims

Cardone first joined Empire in July 1985 at age 51 as Deputy Chairman, leaving the accounting firm of Deloitte, Haskins & Sells ("Deloitte") where he had been a partner since 1970. He and Empire signed a two-year employment contract. The contract included health insurance and other benefits. In the event Cardone retired between the ages of 55 and 65, the contract assured him the same health coverage and other benefits as he would receive if he retired at age 65. Cardone Aff. ¶ 8. If Empire were to terminate Cardone, other than for misconduct, Empire promised to pay Cardone $325,000 per year for up to one year. *Id.*

At its April 1987 meeting, the Board elected Cardone Chairman and CEO. The Board also approved a two-year partial extension of the 1985 contract, to give Cardone "certain" undefined severance benefits should he retire or be terminated after reaching 55 years of age in 1989.

In April 1989, the Board re-elected Cardone Chairman and CEO. The resolution re-

electing Cardone extended to July 28, 1992 certain provisions of the 1985 contract, to provide him "certain [undefined] benefits" should he retire or be terminated after reaching age 55. This apparently referred to the health insurance and other benefits provided under the 1985 contract.

At its April 1992 meeting, the Board again re-elected Cardone Chairman and CEO. The Board adopted a separate benefits resolution far more detailed than any prior benefits resolution. Should Cardone's employment terminate before July 28, 1995, it provided that he would receive a lump sum severance payment ("Lump Sum Payment") to be calculated according to Empire's "Employee Pension Plan C," payable 30 days after his termination, but no later than July 28, 1995. Thus, Empire specifically defined Cardone's post-employment benefit for the first time in 1992. That resolution provided *only* for the Lump Sum Payment.

The following summary of statements precedes the adoption of the Lump Sum Payment resolution in the 1992 Board minutes:

Mr. [Stanley] King [Vice–Chairman of the Board] then called the attention of the Directors to the proposed resolutions before them for consideration and called upon Mr. [Robert] Bicks [counsel] to explain the resolution dealing with renewal of certain severance arrangements entered into with Mr. Cardone some years ago. Mr. Bicks said that *such resolution simply grants* for a period of three years commencing July 28, 1992, the maximum renewal period permitted under law, *the very same benefits assured to Mr. Cardone in 1985* for the maximum then permissible period to induce him to resign his prior position and to accept employment at the Corporation. No additional benefit , is granted.

Cardone Aff. Ex. A (emphasis added).

### THE STANDARD FOR GRANTING SUMMARY JUDGMENT MOTIONS

Rule 56(c) of the Federal Rules of Civil Procedure requires me to grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all inferences against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The disputed issues of fact must be "material to the outcome of the litigation," *id.* at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

### I. THE BENEFITS CLAIMS

Cardone asserts five benefits-related claims for money damages. Claim 1 seeks $1,300,000 from Empire plus fees and a declaration of Cardone's rights under his 1985 employment agreement and later Board res-

olutions pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Claim 2 seeks the same remedy as Claim 1 against Empire and the Board pursuant to ERISA Section 1132(a)(2). Claim 3 seeks injunctive relief, alleging that Cardone suffered "irreparable harm" due to the denial of benefits. Claim 4 seeks damages against Empire for breach of contract and a declaration of rights. Claim 5 seeks damages of $600,000 against Empire plus interest for breach of contract. Claim 6 seeks damages of over $1,300,000 against Empire for breach of contract.

Empire argues that the terms of the relevant contracts defeat Cardone's contract claims to all but the Lump Sum Payment. The parties dispute whether Cardone's benefits constitute a "plan" covered by ERISA. As to the Lump Sum Payment, Empire and Curiale contend it constitutes a "pension" which cannot be paid to Cardone under Section 4312 of the New York Insurance Law without Curiale's approval. Cardone argues that ERISA preempts Section 4312 and therefore, Empire does not need Curiale's approval to make the Lump Sum Payment. I must first evaluate what contractual rights to benefits Cardone has before I can determine if they are covered by ERISA.

### A. The Contract Claims: Claims 4, 5, and 6

Empire and Curiale argue that, at most, Cardone has a claim to the Lump Sum Payment based on the 1992 resolution. Cardone contends that he should also receive health and life insurance benefits based on the 1985 contract and a statement in the 1992 Board minutes. Cardone also claims that he relied to his detriment on an oral agreement to pay him one year's salary, but this contention lacks sufficient support in the record before me.

Cardone's claim that Empire used what he calls "the Benefits Continuation Plan" to induce him to resign from Deloitte, *see* Complaint ("Compl.") ¶¶ 68–69, finds no support in the 1985 Contract or its extensions, as they do not refer to Cardone's leaving his partnership at Deloitte. As a result, any

inducement offered by Empire in connection with Cardone's departure from Deloitte must have been oral. Yet, an oral contract not to be performed within one year is void under the New York Statute of Frauds. N.Y.Gen. Oblig.Law § 5–701(a)(1) (McKinney 1989). Cardone alleges that a "Benefits Continuation Plan" was in effect between July 28, 1985 and May 19, 1993. However, the 1985 Contract and its 1987 and 1989 extensions had all expired when Cardone resigned in 1993.

Cardone argues that promissory estoppel theory may be invoked to estop a Statute of Frauds defense. However, this happens only if the circumstances render it "unconscionable" to refuse to enforce the oral contract. As the Second Circuit has noted:

> The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. For this reason, the doctrine of promissory estoppel is properly reserved for the limited class of cases where 'the circumstances are such as to render it unconscionable to deny' the promise upon which the plaintiff has relied.

*Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir.1977) (citation omitted). New York courts have held that reliance on oral promises of "rosy" benefits from a future employer does not constitute a circumstance rendering it unconscionable to refuse to enforce a contract under the Statute of Frauds. *Ginsberg v. Fairfield–Noble Corp.*, 81 A.D.2d 318, 440 N.Y.S.2d 222, 225 (1st Dep't 1981); *Swerdloff v. Mobil Oil Corp.*, 74 A.D.2d 258, 427 N.Y.S.2d 266, 270 (2d Dep't 1980) (refusing to enforce oral employment contract where plaintiff alleged he was induced to change jobs by alleged oral promise); *Country–Wide Leasing Corp. v. Subaru of Am., Inc.*, 133 A.D.2d 735, 520 N.Y.S.2d 24, 25 (2d Dep't 1987) ("[T]he mere failure to obtain an uncertain prospective benefit does not rise to a sufficient level of unconscionability to warrant the application of the doctrine of promissory estoppel."). Cardone's assertion that he relied on certain statements made by Empire concerning the "Benefits

Continuation Plan" in deciding to resign from Deloitte is merely an assertion of reliance on "rosy promises." This assertion does not pass the "unconscionable" harm test required to overcome the Statute of Frauds. Accordingly, Cardone's promissory estoppel claim must be dismissed.

Cardone's claim to health insurance and other benefits relate back to the 1985 contract and a statement by Empire's counsel, Robert Bicks, in the 1992 minutes. Counsel's statement described the 1992 resolution as providing "the very same benefits assured to Mr. Cardone in 1985." Cardone argues that this reference to the terms of the 1985 contract preserved the rights defined in that contract. Empire, however, contends that the text of the resolution that follows Mr. Bicks' statement in the minutes should prevail over counsel's statement.

At oral argument, Cardone's counsel argued strenuously that, under New York law, Empire's Board minutes are *prima facie* evidence of what occurred at the Board meeting. N.Y. Not-for-Profit Corporation Law § 621(g) (McKinney 1970). While this may be true, it does not help Cardone. The parties do not dispute what was said or done at the 1992 Board meeting; rather they disagree on whether Mr. Bicks' statement or the resolution controls.

 The law and the facts here compel me to conclude that the resolution controls. New York's parol evidence rule forbids the introduction of extrinsic evidence to interpret, vary, or contradict the meaning of an agreement if the agreement is clear on its face. *Leumi–Fin. Corp. v. Richter,* 17 N.Y.2d 166, 269 N.Y.S.2d 409, 413, 216 N.E.2d 579, 582 (1966). While the 1992 minutes reveal an apparent conflict between the statement of Mr. Bicks and a unanimously adopted resolution, the resolution is not ambiguous. It clearly expresses the Board's decision to provide Cardone only the Lump Sum Payment. Furthermore, Empire's By-Laws, Article VIII, Section 2(d), prohibit the Chairman and all officers from receiving "any salary, compensation or emolument" unless authorized by a two-thirds vote of the Board. New York Insurance Law Section 4312 also forbids Empire from entering into an oral agreement with one of its executives to provide any salary, compensation or emolument that will extend beyond a period of one year from the date of the agreement. In short, counsel's statement to Empire's Board cannot alter the clear terms of the 1992 resolution. The 1985 contract and its extensions had expired by 1992. The 1992 Board resolution was the only controlling document in effect when Cardone resigned in 1993. Because that resolution explicitly entitles Cardone only to the Lump Sum Payment, no genuine issue of material fact remains as to Cardone's other contractual claims to employee benefits. They shall be dismissed.

### B. The Section 4312(b) Defense

Empire and Curiale assert as a defense to Cardone's remaining claim to the Lump Sum Payment that it constitutes an unauthorized "pension" benefit. Section 4312(b) of New York's Insurance Law requires that the Superintendent of Insurance approve pension benefits paid to executives of not-for-profit insurance companies such as Empire. When the 1985 contract was made, Section 4312(b) prohibited Empire from contracting with an officer to provide any compensation or emolument beyond two years. Section 4312(b) also permitted Empire to provide executive benefits only pursuant to a plan adopted by the Board and approved by the Superintendent of Insurance. Curiale did not approve the payments Cardone claims. This defense, therefore, hinges upon whether the Lump Sum Payment is a "pension benefit" within the meaning of Section 4312.

Section 4312 does not define the term "pension." The parties, however, agree that ERISA provides a good framework for determining whether the Lump Sum Payment is a "pension." ERISA defines a "pension plan" as anything that "by its express terms or as a result of surrounding circumstances" "(i) provides retirement income ... or (ii) results in a deferral of income [until] termination or beyond." 29 U.S.C. § 1002(2). The tautological relationship between "pension" and "retirement income" renders definition "(i)" of little use. Curiale and Empire argue that the Lump Sum Payment defers income until

termination, but they have offered little support for this proposition.

█ The 1992 resolution does not clearly settle the matter. Although it calls the Lump Sum Payment a "severance payment," this characterization cannot alone control. Rather, I must look to the substance of the agreement to evaluate its legal effect. That the Payment was to be paid in a lump sum is not dispositive, either. Both severance payments and pension plans may allow an employee to elect a one-time payment in lieu of periodic payments. One hallmark of a pension is that eligibility depends upon the employee's attainment of a predetermined age or length of service to the employer. Empire argues that the Payment was intended to supplement Cardone's actual pension benefit if he left Empire before July 28, 1995, so that Cardone's total retirement benefit would equal that which he would have received had he retired at age sixty-five in 1999. Cardone's eligibility to receive the Lump Sum Payment was not conditioned upon age or length of service to Empire. However, Cardone's age was a factor in calculating the amount of the Lump Sum Payment. In light of the substantial dispute as to whether the Lump Sum Payment is a "pension" and the heavy burden that must be met in order to grant such drastic relief, summary judgment will be denied on the Section 4312(b) defense. The dispute over the Lump Sum Payment must await trial on the merits.

### C. The ERISA Claims: Claims 1 and 2

In determining whether ERISA governs a benefit, the Supreme Court has distinguished one-time payments from "benefit plans." In *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 19, 107 S.Ct. 2211, 2221, 96 L.Ed.2d 1 (1987), the Court held that ERISA did not preempt a Maine statute that required the payment of a lump sum, one-time severance payment to employees at a plant closing because the statute did not require the creation of a benefit "plan" since it required no "ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. at 2217.

█ The Second Circuit has held that a severance pay program more complex than Cardone's was not an ERISA "plan." *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 466 (2d Cir.1993). In *James*, the court held that an employer's offer of severance payments consisting of 60 days additional pay did not constitute a plan, even though the employees could elect to receive the money in bi-weekly installments rather than as a lump sum. *Id.* The *James* court emphasized that no administrative scheme was necessary to meet the employer's obligation, even though "[e]mployees had different termination dates and different eligibility for receiving the payment; the payments had to be calculated individually and deductions for social security taxes, health and medical benefits, and 401k plans had to be made." *Id.* at 467. The court found that the employer did not have to establish an administrative scheme because only "simple arithmetical calculations" were required. *Id.* at 467. Calculation of Cardone's Lump Sum Payment requires no more than this, and did not cause Empire to establish an administrative scheme. Accordingly, I hold that the Lump Sum Payment was not a part of a "plan" covered by ERISA, and Cardone has no claim thereunder. Claims 1 and 2 shall be dismissed for failure to raise genuine issues of material fact.

### D. The Claim for Injunctive Relief: Claim 3

Cardone has alleged nothing relating to his benefit claims for which money damages could not compensate him. His conclusory allegations of "irreparable harm" border on the frivolous. As no grounds exist for granting injunctive relief Claim 3 must be dismissed.

### II. THE CIVIL RIGHTS CLAIM

█ Cardone asserts Claim 11 against Curiale, individually and in his official capacity, and against Empire and the Board members pursuant to 42 U.S.C. § 1983 for violating his ERISA rights. Section 1983 is designed to vindicate the deprivation of federal rights. Aside from ERISA rights, Cardone has asserted no federal rights. Because I

have already determined that Cardone's surviving benefit does not constitute a "plan" covered by ERISA, Cardone has no federal rights left that Section 1983 could vindicate. Accordingly, Claim 11 must be dismissed.

## III. THE TORT CLAIMS

### A. The Complaint's Allegations Regarding the Tort Claims

Claims 8, 9, and 10 concern allegations of defamation arising from the media coverage of Empire's difficulties generally, and specifically regarding the discrepancies between Empire's internal and external financial reports. Cardone alleges that various statements, "as intended by Vogt and/or other" persons connected with Empire, "were understood by those to whom they were spoken to charge plaintiff with having committed improper, unlawful and criminal acts." Compl. ¶ 78. He adds that they "were known by [the speaker] to be false and defamatory or were spoken with reckless disregard for the truth thereof, and with the intent to wrongfully and maliciously injure and damage plaintiff in his good name, reputation and profession." Compl. ¶ 78. Cardone asserts that he "has been injured in his profession and ... reputation and has suffered great pain and mental anguish and has incurred damages including medical and related expenses." Compl. ¶ 79. Cardone's false light and *prima facie* tort claims repeat the factual basis of the defamation claim. Compl. ¶¶ 80, 83.

### B. The Defamation Claim

■ Under New York law a complaint sounding in libel must allege: a false and defamatory statement of and concerning plaintiff; publication to a third party; fault, depending on the status of the libeled party; and special harm or *per se* actionability. *Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. 661, 666 (S.D.N.Y.1991).

■ Cardone's defamation claim fails on several grounds, first and foremost insufficient proof that the statements were "of and concerning" him. In order to state a libel claim, plaintiffs must allege facts showing that the alleged defamatory statement

was published "of or concerning" them. *Allen v. Gordon,* 86 A.D.2d 514, 446 N.Y.S.2d 48, 49 (1st Dep't), *aff'd,* 452 N.Y.S.2d 25, 437 N.E.2d 284 (1982); *Julian v. American Business Consultants, Inc.,* 2 N.Y.2d 1, 155 N.Y.S.2d 1, 15–16, 137 N.E.2d 1, 11–12 (1956). Whether the complaint alleges facts sufficient to demonstrate a reasonable connection between the plaintiff and the alleged libel is a question for the court. *Springer v. Viking Press,* 60 N.Y.2d 916, 470 N.Y.S.2d 579, 580, 458 N.E.2d 1256, 1257 (1983); *Carlucci v. Poughkeepsie Newspapers, Inc.,* 57 N.Y.2d 883, 456 N.Y.S.2d 44, 45, 442 N.E.2d 442, 443 (1982). Where the alleged statements are incapable of supporting a finding that such statements refer to plaintiff, the court should dismiss the claim. *See Church of Scientology Int'l v. Time Warner, Inc.,* 806 F.Supp. 1157, 1160 (S.D.N.Y.1992). After examining the articles, press releases and affidavits, I find that no reasonable person could conclude that the statements here referred to Cardone. The pleadings amply demonstrate that Empire and Vogt never mentioned Cardone's name in any of the press releases. This absence is conspicuous because the press releases do mention Empire's former CFO by name, and refer to other auditors as potentially involved in filing the misleading statements.

■ Cardone argues that he has a libel claim if those who know him would, upon reading the allegedly libelous statement, understand that he was the target of the statement. *Fetler v. Houghton Mifflin Co.,* 364 F.2d 650, 651 (2d Cir.1966); *Time Warner,* 806 F.Supp. at 1160. These statements can be found to concern Cardone only if those who know Cardone could conclude that as CEO and Chairman he was directly responsible for all defalcations of his subordinates. It may be that as captain of Empire he had ultimate responsibility, but that does not mean he was libeled when the acts of other Empire employees were impugned. Indeed, Empire's statements to the media expressly stated that it would not speculate on the extent of any individual's involvement in the alleged misconduct. Because I cannot find that these statements were "of and concern-

ing" Cardone, the defamation claim must be dismissed.

## C. The "False Light" Claim

 New York does not have a common law tort protecting privacy against publicity that unreasonably places a person in a "false light." *Howell v. New York Post,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699, 703 (1993). Consequently, claim 9 alleging "false light" must be dismissed as a matter of law.

## D. The Prima Facie Tort Claim

 Claim 10 alleges that Vogt and other representatives of Empire made statements "maliciously, wantonly, recklessly and without legal justification and without regard to the rights of the plaintiff." Compl. ¶ 84. Again, plaintiff pleads damages in the nature of pain and mental anguish, professional and reputational harm, and medical expenses. Compl. ¶ 82, 85. New York law recognizes the "general principle that harm intentionally inflicted is *prima facie* actionable unless justified." *Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469, 469 N.E.2d 1324, 1327 (1984). The principle permits recovery for *prima facie* tort where four elements are shown: i) the intentional infliction of harm, ii) causing special damages, iii) without excuse or justification, iv) by an act or series of acts that would otherwise be lawful. *Id.*

In order to recover for *prima facie* tort, the plaintiff must allege that the only motivation for the alleged conduct was to harm the plaintiff. *Curiano,* 480 N.Y.S.2d at 469, 469 N.E.2d at 1327. Cardone's affidavits have not raised a genuine issue of material fact that the statements here were solely motivated by a desire to harm him. The record amply demonstrates that Vogt and Empire were trying to diffuse bad publicity. Even if it were assumed that Vogt and other Empire officers harbored ill will toward Cardone, Cardone has made no showing that they were motivated solely by that ill will. Quite to the contrary, the record is clear that Vogt and others went out of their way to avoid mentioning Cardone by name. The absence of any evidence that the defendants intended to harm Cardone suffices to defeat his *prima facie* tort claim.

## CONCLUSION

The defendants' motions for summary judgment are granted in part and denied in part. Cardone's Benefits, Tort and Civil Rights Claims shall be dismissed with prejudice except for his contractual claim for the Lump Sum Payment. Cardone's summary judgment motion is denied in its entirety.

**SO ORDERED**