Dr. Leo **KIRCH**, individually and as assignee, KGL Pool GMBH, and International Television Trading Corp., Plaintiffs–Appellants,

v.

**LIBERTY MEDIA CORP.**, John Malone, Deutsche Bank AG, and Dr. Rolf–Ernst Breuer, Defendants–Appellees.

Docket No. 04–5852–cv.

United States Court of Appeals, Second Circuit.

Argued: Oct. 21, 2005.

Final Submission: Nov. 17, 2005.

Decided: June 5, 2006.

As Amended July 14, 2006.

Rodney A. Smolla, University of Rich-
mond School of Law, (David Boies, Alan B.

Vickery, Philippe Z. Selendy, of counsel, Boies, Schiller & Flexner, LLP, New York, NY), Richmond, VA, for Plaintiff–Appellant Dr. Leo Kirch.

Michael E. Petrella, Law Offices of Sean F. O'Shea, New York, NY, for Plaintiff–Appellant International Television Trading Corp.

R. Stan Mortenson, Baker Botts, LLP (Jeffrey A. Lamken, Michael L. Calhoon, of counsel), New York, NY, for Defendants–Appellees Liberty Media, Corp. and John Malone.

Jeffrey Barist, Milbank, Tweed, Hadley & McCloy LLP, New York, NY, for Defendants–Appellees Deutsche Bank AG and Dr. Rolf–Ernst Breuer.

Before: OAKES, JACOBS, and SACK, Circuit Judges.

SACK, Circuit Judge.

Plaintiff-appellant Dr. Leo Kirch is the founder of KirchGroup, once a prominent German group of mass-media entities. He alleges that defendants-appellees Liberty Media Corp. ("Liberty") and Deutsche Bank AG ("Deutsche Bank") had strong economic interests in seeing Kirch's empire broken apart and that, in order to bring about such a breakup, they conspired to ensure KirchGroup's financial collapse. Dr. Kirch further alleges that in February 2002, defendant-appellee Dr. Rolf–Ernst Breuer, who was the chief executive officer of Deutsche Bank, stated during a German-language interview by a journalist in New York City that Breuer doubted whether the financial community was willing to lend KirchGroup the money it needed to survive the liquidity crisis it faced. Kirch asserts that this statement was false and that Breuer knew it was false when he made it. Less than three months later, KirchGroup, unable to se-cure necessary financing, sought bankruptcy protection under German law.

In February 2003, Dr. Kirch filed a complaint against Deutsche Bank and Breuer (the "Deutsche Bank defendants") in New York State Supreme Court, New York County, alleging causes of action for defamation, tortious interference with contract, tortious interference with prospective economic advantage, and civil conspiracy. In January 2004, the complaint was amended to add as a plaintiff International Television Trading Corp. ("ITTC"), a corporation with its headquarters in South Egremont, Massachusetts. ITTC served as KirchGroup's exclusive agent in North America and, according to the plaintiffs, was known in the industry as the "face" of the KirchGroup in North America. KGL Pool GmbH ("KGL") was also added as a plaintiff, and Liberty, a major American media company, and its chief executive officer, John Malone, were added as defendants (the "Liberty defendants"). The Deutsche Bank defendants, with the consent of the Liberty defendants, removed the case to the United States District Court for the Southern District of New York. In September 2004, the district court (Naomi Reice Buchwald, *Judge)* dismissed the complaint in its entirety for failure to state a claim upon which relief can be granted. *See Kirch v. Liberty Media,* 2004 WL 2181383, 2004 U.S. Dist. LEXIS 19228 (S.D.N.Y. Sept.27, 2004).

We affirm the district court's dismissal of all of ITTC's claims. We also affirm its judgment with respect to the tortious interference with contract claim. We conclude, however, that the court did not sufficiently consider the *forum non conveniens* issue briefed by both parties in the district court. Therefore, without deciding the defamation, tortious interference with prospective economic advantage, or civil conspiracy claims alleged by the

plaintiffs other than ITTC, we remand for the court to decide whether what remains of this matter should be dismissed under the doctrine of *forum non conveniens*.

## BACKGROUND

We are required, on this appeal from the district court's judgment dismissing the plaintiffs' complaint under Rule 12(b)(6), to "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff[s'] favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006). We therefore set forth those allegations in some detail, well aware that the defendants filed answers in the district court denying the substance of those assertions, and that should this litigation go forward on the merits, any number of them may prove to be untrue.

### The Restructuring of KirchGroup

Dr. Kirch founded KirchGroup in the 1950s. By the 1990s it was one of the largest media groups in the world. Its assets included Germany's only pay television channel, many popular television programs, the distribution rights to a large library of American films and television programs, and the television exhibition rights to such major sporting events as the World Cup and Formula One auto racing.

KirchGroup had long been privately owned. Beginning in the 1990s, however, Dr. Kirch began to develop a long-term plan to transform it into a single publicly traded company. This plan, developed in consultation with the New York-based investment bank Lehman Brothers, required that the company undergo three consecutive "restructuring events," dubbed, respectively, "Project Traviata," "Project Concordia," and "Project Galaxy." Am. Compl. ¶ 13.

Project Traviata, which KirchGroup completed in 1999, reorganized the company into three entities: (1) KirchMedia, which held KirchGroup's free television programs, media rights, and sports businesses other than Formula One racing; (2) KirchPayTV, which held its pay television platform; and (3) KirchBeteiligungs, which controlled its Formula One interests and its print publishing business, PrintBeteiligungs GMBH, which itself held a forty percent stake in one of Germany's largest publishers, Axel Springer Verlag AG ("ASV"). Each of these entities was a subsidiary of a central management holding company, TaurusHolding GMBH ("Taurus"). Under Project Traviata, KirchGroup also attracted outside strategic investors who provided industry expertise and capital. These investors included News Corp., controlled by Rupert Murdoch, and Mediaset, S.p.A., controlled by former Italian Prime Minister Silvio Berlusconi.

In 2000, pursuant to this phase of the restructuring, KirchGroup merged two of its television networks, SAT.1 and Prosieben, into one publicly traded entity called ProSiebenSat.1 Media AG, which then held the largest market share in German television advertising revenue. In order to secure the consent to the merger from ASV, which owned a minority interest in SAT.1, Kirch granted ASV a "put" option in the newly merged entity, entitling ASV to sell to Kirch ASV's shares in ProSiebenSat.1 at an agreed upon price anytime on or before January 31, 2002.

Project Concordia, unveiled in September 2001, would have merged ProSiebenSat.1 into KirchMedia by June 2002, thereby creating a publicly traded company that could raise money in public securities markets. The merger would also have combined KirchGroup's television content and network assets. KirchGroup retained several investment banks, including JP Morgan, Lehman Brothers, and Credit Suisse

First Boston, to advise it on the transaction. In September 2001, Dr. Kirch and ASV agreed in principle to the merger and began five months of negotiations toward its consummation. When the deal seemed to be nearing completion, KirchGroup began working on the third and final phase of the restructuring strategy, Project Galaxy.

Because the ownership structure of KirchGroup's various companies was highly complex, KirchGroup had to conduct a variety of inter-company transactions before it could unify all of its assets under the ownership of one publicly traded company. Executing such transactions, which would inject several billion dollars of new capital by multiple investors in the enterprise, was the goal of Project Galaxy. This final stage of restructuring would have allowed Dr. Kirch to consolidate all of his assets into one company that would then hold an initial public offering in 2004 or 2005. Taurus, the holding company, retained JP Morgan and Lehman Brothers to help Kirch implement this plan.

*The Alleged Conspiracy*

Kirch alleges that Liberty and Deutsche Bank both wanted to derail Project Galaxy. In September 2001, Liberty announced that, as part of its global expansion, it intended to buy six regional cable systems from Deutsche Telekom ("DT"), a large communications company in which the German government held a forty percent stake, for 5.5 billion euros. Because KirchGroup had preexisting long-term leases with DT that granted KirchGroup bandwidth access sufficient for more than forty of its channels, and because KirchGroup already owned the most valuable programming content, including exhibition rights to films, television programs, and sporting events, Liberty viewed KirchGroup as an important competitor in the German cable market. Thus, say the plaintiffs, Liberty would directly benefit from the breakup of KirchGroup.

According to the plaintiffs, Deutsche Bank also had powerful incentives to see KirchGroup's restructuring fail. For one thing, the ensuing breakup would generate large fees for its investment banking division. Thus, the plaintiffs allege, in the fall of 2001, Breuer frequently traveled to New York City to discuss KirchGroup's situation with the investment bankers.

Also, the plaintiffs allege, two of Deutsche Bank's biggest customers, DaimlerChrysler and FIAT, in each of which Deutsche Bank held a large equity stake, sought to secure a controlling equity interest in Formula One racing. Each of them, with the support of Deutsche Bank, had tried to block KirchGroup's acquisition of Formula One in 2001. The plaintiffs contend that Deutsche Bank knew that if it were the lead advisor on the breakup, it could direct the sale of the Formula One properties to either DaimlerChrysler or FIAT.

Finally, the plaintiffs allege, Deutsche Bank had already shown an interest in investing in the German cable business, having attempted to buy DT's cable system in 1999. That attempt failed. In 2001, however, one of Deutsche Bank's subsidiaries bought Germany's second largest cable system operator, TeleColumbus GMBH ("TeleColumbus"). Because TeleColumbus was forced to buy its cable television programs from KirchGroup, however, KirchGroup's continued dominance in cable programming dampened TeleColumbus's profits.

In sum, the plaintiffs allege, Deutsche Bank stood to gain a total of at least one billion dollars from the breakup of KirchGroup.

According to the plaintiffs, Liberty and Deutsche Bank conducted a series of "se-

cret meetings" in which they planned to destroy KirchGroup. Under the terms of the arrangement, Liberty would take control of Deutsche Bank's cable holdings. It would also help to ensure that Deutsche Bank presided over the breakup of KirchGroup, earning substantial fees in the process. Meanwhile, the Deutsche Bank defendants would use their influence in the financial community to pressure KirchGroup's lenders into forcing Dr. Kirch to surrender control of his businesses. This would allow Liberty to dominate the German cable market.

The plaintiffs allege that in the Spring of 2001, Breuer met with Kirch in an effort to obtain additional business from KirchGroup, but neither he nor anyone else at Deutsche Bank ever mentioned to Kirch that the bank was working with Liberty to dismantle Kirch's empire. Quite the contrary, the allegations continue, Kirch thought that Deutsche Bank was acting in the interests of KirchGroup and, accordingly, shared confidential KirchGroup information with Deutsche Bank.

In November 2001, however, Liberty and Deutsche Bank announced that Deutsche Bank's TeleColumbus would merge into Liberty Kabel Deutschland, Liberty's German cable company. In return, Deutsche Bank would receive a twelve percent equity stake in Kabel. Soon thereafter, Liberty made a bid to acquire a stake in KirchPayTV from BSkyB, one of the outside investors brought in under Project Traviata. Dr. Kirch did not learn of Liberty's effort to seize control of KirchPayTV until the deal was announced on November 15, 2001. During a meeting with Malone that day, Kirch was informed that Malone had publicly announced his plans to seize one of Kirch's companies.

Meanwhile, Dr. Kirch, proceeding with Project Galaxy, was working with JP Morgan to secure equity investments from such media conglomerates as AOL Time Warner, News Corp., and DT. Although Time Warner rejected the proposal and News Corp. failed to express significant interest, by January 2002, DT had decided to pursue the investment. The parties intended to complete negotiations by the end of February. Securing such investments was vital for KirchGroup because, having paid large sums for expensive long-term sports broadcasting licenses, the company was becoming increasingly leveraged.

The plaintiffs allege that Deutsche Bank and Liberty knew that KirchGroup was in the midst of a financial crisis. They assert that the Bank had also learned from press reports that KirchGroup remained in negotiations with ASV over the merger of KirchMedia and ProSiebenSat.1 and that ASV was threatening to exercise its put option to force Kirch to buy ASV's shares in ProSiebenSat.1. Since the option price exceeded ProSiebenSat's then-current trading price, ASV's exercise of the option would have forced Kirch to raise cash from sources other than ProSiebenSat.1

But, according to the plaintiffs, the defendants were also aware that KirchGroup was "poised" to secure the financing necessary to survive this crisis. Am. Compl. ¶ 54. Deutsche Bank knew about Project Galaxy, because KirchGroup had approached Deutsche Bank about participating in the project in the spring of 2001, and KirchGroup, as noted, had sent Deutsche Bank confidential material related to the project. By January 2002, the plaintiffs allege, Deutsche Bank also knew that all of KirchGroup's four major lenders, DZ Bank, Bayerische Landesbank, HypoVereinsbank, and Commerzbank (the "Pool Banks"), had agreed in principle to extend repayment deadlines, set for late 2001 and early 2002, until June 30, 2002.

In addition, Deutsche Bank was aware that KirchGroup was in negotiations with motion picture studios in the United States for long-term television distribution agreements that promised to reduce the cost of KirchGroup's television content acquisition. Deutsche Bank also knew that KirchGroup had already reached an agreement with Sony to restructure its television output contracts. Thus, according to the plaintiffs, Deutsche Bank and Liberty knew of both the financial challenges KirchGroup faced and the efforts it was making to ensure its long term financial health.

The plaintiffs allege that the defendants conspired to thwart these efforts. They say that Deutsche Bank and Liberty convinced Rupert Murdoch, who had economic power with respect to KirchGroup by virtue of his $1.75 billion put option in BSkyB, to persuade Friede Springer, ASV's largest shareholder, to support ASV's exercise of its put option for ProSiebenSat.1. At the same time, Deutsche Bank promised Springer that if ASV were to exercise the option, Deutsche Bank would convey to Springer a sufficient number of KirchGroup's shares in ASV to guarantee her control over ASV. On January 23, 2002, after months of negotiations with KirchGroup over Project Concordia, ASV abruptly terminated the talks and informed KirchGroup that it intended to exercise its put option on the January 30 expiration date, requiring Dr. Kirch to pay ASV $ 660 million for its shares in ProSiebenSat.1 within ninety days.

Four days later, on January 27, 2002, Breuer and two of KirchGroup's publishing competitors, Erich Schumann, head of Westdeutsche Allegmeine Zeitung ("WAZ"), and Dr. Thomas Middelhoff, chief executive officer of Bertelsmann AG, met with Gerhard Schroeder, Germany's then-Chancellor. During that meeting, the plaintiffs allege, Breuer and the two other publishers told the Chancellor about their plan to break up KirchGroup. The plan provided that: (1) WAZ or Springer would buy Dr. Kirch's shares in ASV; (2) Murdoch would be allowed to purchase KirchPayTV but no other Kirch assets; (3) Dr. Kirch would retain only a minority of shares in the company, with little or no influence on its business; (4) KirchGroup's free television operations would be sold to various smaller players, ensuring that Bertelsmann would remain the dominant player in that market.

Fearing that Dr. Kirch would not be a willing participant in the plan, the plaintiffs' allegations continue, the defendants took the steps necessary to ensure that he would participate unwillingly. First, on January 30, 2002, as it had warned, ASV exercised its put option. Then, on February 3, while in New York City for the World Economic Forum, Dr. Breuer made the comments that underlie this lawsuit in the course of an interview, conducted in German, by a reporter for Bloomberg Television. The relevant portion of the interview, translated from German to English, is set forth verbatim in the complaint:

Q. Let's talk about another big topic right now in Germany: the KirchGroup and the problems concerning its indebtedness. According to an article in the Financial Times, you talked to the German chancellor about Kirch. Did you?

A. I cannot comment on this. It is up to the chancellor to say whether he talked to me or not.

Q. Let's ask this in a different way. Kirch has many, many debts, very large debts. What is Deutsche Bank's exposure?

A. I'd say [we are] relatively comfortable. First, and that is known and I

am not indiscreet by telling you, our credit is not one of the largest ones but it is relatively in the middle amount-wise, and second, the credit is fully secured by a pledge of Kirch's shares in [Axel] Springer Verlag [AG]. Hence, we are practically safe, and we feel well secured. It is never nice when a debtor runs into difficulties, and I hope this is not the case. But if this turned out to be, we should not be worried.

Q. It is more a question of whether someone will help him to carry on.

A. I believe this is relatively questionable. All that you can hear and read about this is that the financial sector is not willing to provide further debt or equity under current conditions. Hence, only third parties could be interested in a—as you phrased it—support action.

Q. Thank you very much, Rolf Breuer.

Am. Compl. ¶ 63 (emphasis deleted).

According to the plaintiffs, Breuer's comments set off a "firestorm of controversy." *Id.* at ¶ 67. The interview was broadcast eighteen hours later in Germany, and a brief English description of the interview was distributed by Bloomberg's online service.[1] The story was also picked up by other investment news services, one of which reported that Breuer had "publicly snubbed" Kirch in "an unprecedented manner." *Id.* at ¶ 68 (translated from the German original).

The plaintiffs allege that as a result of the comments, the investors and lenders with which KirchGroup had been working lost confidence in the company. Bayerische Landesbank, which had agreed in principle to extend its credit arrangements with KirchGroup, now refused to do so for fear of incurring legal liability. The other Pool Banks refused to honor KirchGroup's checks or to extend its loans. JP Morgan, which had been working with KirchGroup on Project Galaxy, abandoned the plan. The American motion picture studios (save Sony, which had already signed a contract) cut off negotiations for distribution deals. Unable to pay its debts, KirchGroup sought bankruptcy protection in Germany on April 8, 2002. As a result, Dr. Kirch lost control of his business, and ITTC "lost virtually its entire business." *Id.* at ¶¶ 6, 76.

### The German Action

In May 2002, Dr. Kirch filed suit in Germany against Deutsche Bank and Breuer. The scope of the suit is a matter in dispute. It appears, though, that Kirch alleged, among other things, that Breuer's statements in the Bloomberg interview constituted a breach of Breuer's and Deutsche Bank's fiduciary duty of confidentiality to KirchGroup, which was based on KirchGroup's preexisting agreement with Deutsche Bank for financial services. The German court concluded that Deutsche Bank, but not Breuer, had breached such a duty. The case was on appeal at the time of the district court's ruling in the present appeal.

### The Present Action

On February 3, 2003, Dr. Kirch filed a complaint against Breuer and Deutsche Bank in State Supreme Court, New York

---

1. The description reads:

   New York, Feb. 3, 2002 (Bloomberg)—Rolf Breuer, chief executive of Deutsche Bank AG, talks with Bloomberg's Michael Storfner about the outlook for the U.S. and European economies, business in the first quarter and the bank's exposure to Kirch-Holding GMBH, which has $5 billion of debt and is under pressure from creditors. They speak at the World Economic Forum. (German).

   Am. Compl. ¶ 64.

County. On January 14, 2004, he amended his complaint, adding Liberty and Malone as defendants; ITTC and KGL joined as plaintiffs. The Deutsche Bank defendants, with the consent of the Liberty defendants, then removed the action to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1446, invoking the court's diversity jurisdiction. On March 5, 2004, the defendants moved to dismiss the complaint on the grounds of res judicata (based on the German decision), *forum non conveniens*, and failure to state a claim upon which relief can be granted.

On September 24, 2004, the district court granted the motion to dismiss. Specifically, it concluded that:

(1) Breuer's comments were "pure opinion" and were therefore not actionable defamation under New York law. *Kirch*, 2004 WL 2181383, at *6–*7, 2004 U.S. Dist. LEXIS 19228, at *20–*24. And even if the comments were not protected opinion, the plaintiffs failed to allege falsity inasmuch as they alleged only that the Pool Banks were willing to extend the repayment of *existing* loans, not to provide "further debt or equity," which were the words Breuer had used. *Id.* 2004 WL 2181383 at *7, 2004 U.S. Dist. LEXIS 19228, at *27.

(2) Kirch failed to state a claim for tortious interference with contract, because he did not allege that JP Morgan or any other third party had committed an "actual breach" of a formal agreement between it and KirchGroup. *Id.* 2004 WL 2181383 at *8, 2004 U.S. Dist. LEXIS 19228, at *28–*30.

(3) The plaintiffs did not adequately plead tortious interference with prospective economic advantage because they failed to allege that the defendants had used "wrongful means" or malice. Neither Breuer's comments, which did not constitute actionable defamation, nor the indirect efforts the defendants used to persuade Springer to exercise the put option, constituted "wrongful means." *Id.* 2004 WL 2181383 at *8–*10, 2004 U.S. Dist. LEXIS 19228, at *31–*40.

(4) The plaintiffs' civil conspiracy claim failed because they had not pleaded an actionable tort necessary to support it. *Id.* 2004 WL 2181383 at *10–*11, 2004 U.S. Dist. LEXIS 19228, at *41.

(5) ITTC could not pursue a defamation action against the defendants, because Breuer's comments were not "of and concerning" ITTC. *Id.* 2004 WL 2181383 at *5 n. 15, 2004 U.S. Dist. LEXIS 19228, at *19 n. 15.

(6) ITTC lacked "standing" to bring a tortious interference with prospective economic advantage claim, because it did not allege any cognizable harm under tortious interference law. *Id.* 2004 WL 2181383 at *8 n. 26, 2004 U.S. Dist. LEXIS 19228, at *33 n. 26.

The court decided neither the res judicata nor the *forum non conveniens* issues raised by the defendants. It did note, however, that it might have been inclined to grant the motion to dismiss on the grounds of *forum non conveniens* if it had decided the issue. See id. 2004 WL 2181383 at 11 n. 31, 2004 U.S. Dist. LEXIS 19228, at *40 n. 31.

The plaintiffs appeal.

## DISCUSSION

### I.  Standard of Review

"We review *de novo* the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir.2006) (internal quotation marks and citation

omitted). Still, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d. Cir.2002) (internal quotation marks and citation omitted).

## II. ITTC's Claims

The district court properly dismissed ITTC's defamation, tortious interference, and civil conspiracy claims on the grounds that Breuer's statements were not "of and concerning" ITTC and that ITTC had failed to state harm cognizable under tortious interference law.

### A. Defamation

"It is essential in making out a prima facie case in libel to prove that the matter is published of and concerning the plaintiff." *Julian v. Am. Bus. Consultants, Inc.*, 2 N.Y.2d 1, 17, 137 N.E.2d 1, 17, 155 N.Y.S.2d 1, 16 (1956); *see also Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980) ("[P]laintiffs in defamation proceedings bear the burden of demonstrating that the libel designates the plaintiff in such a way as to let those who knew her understand that she was the person meant." (internal quotation indication and citation omitted; alteration incorporated)).

ITTC is entirely separate from, and structurally independent of, KirchGroup. Breuer's comments were not about ITTC. They were about KirchGroup and its cash flow problem. We know of no principle of defamation law that permits someone to recover for a defamation of another solely

because the communication contains an allegedly false implication that the person bringing suit is at risk of loss. *See, e.g, AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir.1990) (affirming dismissal of defamation claims brought by individual investors when the allegedly defamatory statements were made about an enterprise in which they invested and did not mention the individual investors); *McBride v. Crowell–Collier Publ'g Co.*, 196 F.2d 187, 189 (5th Cir.1952) (holding that stockholder cannot recover for allegedly defamatory statements about business); *Cardone v. Empire Blue Cross & Blue Shield*, 884 F.Supp. 838, 847 (S.D.N.Y.1995) (concluding that saying something defamatory of a subordinate does not defame a chief executive of a corporation); *Afftrex, Ltd. v. Gen. Elec. Co.*, 555 N.Y.S.2d 903, 905, 161 A.D.2d 855, 856 (3d Dep't 1990) (concluding that allegedly defamatory statement about "the owner" of a company did not defame the company); *Cohn v. Nat'l Broadcasting Co.*, 67 A.D.2d 140, 414 N.Y.S.2d 906 (1st Dep't 1979) (deciding that it is not defamatory of a law firm to say something defamatory about one of its partners), *aff'd*, 50 N.Y.2d 885, 408 N.E.2d 672, 430 N.Y.S.2d 265, *cert. denied*, 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980).[2] A false disparaging statement about IBM, for example, would not, we think, ordinarily be a defamatory statement "of and concerning" all of IBM's suppliers, employees and dealers, however much they may be injured as a result.

---

**2.** *See also Smith v. Long Island Youth Guidance, Inc.*, 181 A.D.2d 820, 821–22, 581 N.Y.S.2d 401, 402–03 (2d Dep't 1992) (concluding that statement that a girl was " 'sold to neighborhood men from the time she was 11 ... sold to support a crack habit' " was not of and concerning her mother); *Zucker v. County of Rockland*, 111 A.D.2d 325, 326, 489

N.Y.S.2d 308, 309 (2d Dep't 1985) (holding that a statement that the plaintiff was " 'involved with the law' " "cannot be said to be defamatory as to the plaintiff parents, as they are neither mentioned by name nor otherwise identified, and no other theory of liability is even suggested").

There are indeed cases, as ITTC points out, where a statement was held to be "of and concerning" the plaintiff even though on its face it was aimed at another person or entity. Yet, in each such case, the statement, though not naming the plaintiff, could have been understood by a reasonable reader as being, in substance, actually *about* him or her.

*Geisler,* for example, was a classic "libel by fiction" case presenting the question whether the plaintiff, after whom a fictional character was apparently modeled, was similar enough to the fictional character that defamatory statements in the fictional work might be found by a trier of fact actually to be about—"of and concerning"—the plaintiff. See *Geisler,* 616 F.2d at 639. There is no similar allegation here that anyone who read Breuer's statement that "[a]ll that you can hear and read about this is that the financial sector is not willing to provide further debt or equity [to Kirch] under current conditions," thought or might reasonably have thought that Breuer was suggesting that the financial sector was not willing to provide further debt or equity *to ITTC.*

Similarly, in *Golden Bear Distributing Systems v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.1983), the Fifth Circuit concluded, applying Texas law, that where the plaintiff company's business was selling a third-party company's products using the third-party company's name as its own, the communication in issue that defamed the third-party company also defamed the plaintiff. Here, there is no similar allegation that the persons who read Breuer's comments were misled into thinking that Breuer was talking about ITTC when he made statements about the financial condition of Kirch or KirchGroup.

*Caudle v. Thomason,* 942 F.Supp. 635 (D.D.C.1996), is not to the contrary. There the plaintiff was the president and chief executive officer of a corporation. Caudle alleged that he was defamed by allegations of fraud and corrupt practices made about actions taken by the corporation. The district court concluded that he had stated a claim of defamation. According to the complaint, which the court was required to accept as true for the purposes of the defendant's motion to dismiss, the plaintiff " 'made all business decisions regarding corporate actions which are the subject matter of [the] lawsuit.' " *Id.* at 638. The court was therefore "unable to say that a reasonable listener ... would not infer that [the plaintiff] was responsible for or involved with the alleged wrongdoings." *Id.* The allegations of fraud and corruption were, in other words, not only about the plaintiff's company, but also about the individual plaintiff.

And in *Gorman v. Swaggart,* 524 So.2d 915 (La.Ct.App.1988), *cert. denied,* 489 U.S. 1017, 109 S.Ct. 1134, 103 L.Ed.2d 195 (1989), the Louisiana appellate court concluded that the "Marvin Gorman Ministries" could bring suit about allegations that the eponymous Marvin Gorman had acted immorally because the reputations of the man and his church were inextricably intertwined. However, the court explicitly relied on "[t]he unusual nature of this relationship" to distinguish the case from those to which "the *general* rule that an action for defamation is personal to the one defamed and cannot be asserted by one only indirectly affected" applies. *Id.* at 919 (emphasis in original). Even if New York law is similar to Louisiana's, we see no ground for relying on such an exception based on the business relationship between ITTC and KirchGroup.

The "of and concerning" requirement stands as a significant limitation on those who may seek a legal remedy for communications they think to be false and defam-

atory and to have injured them.[3] We see no basis for concluding that the statements at issue here were of and concerning ITTC.

### B. Tortious Interference with Prospective Economic Advantage

■ The district court also correctly concluded that whether or not the other plaintiffs adequately pleaded tortious interference with prospective economic advantage, ITTC did not do so because it did not state a cognizable injury under New York tortious-interference law.[4]

■ Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir.2003).

■ The complaint alleges that ITTC was in negotiations with various American movie studios on behalf of KirchGroup to restructure KirchGroup's television content distribution deals. Am. Compl. ¶ 53. According to the complaint, ITTC was conducting such negotiations as an agent for KirchGroup. *Id.* ¶ 6 (alleging that ITTC served as KirchGroup's "exclusive agent"

in North America). In New York, agents or brokers cannot recover on the basis of interference with the transactions or business relationships for which they are serving as an agent or broker. *See Maruki, Inc. v. Lefrak Fifth Ave. Corp.*, 161 A.D.2d 264, 268, 555 N.Y.S.2d 293, 296 (1st Dep't 1990) ("[T]he law is well settled that tortious interference with contract does not extend to a broker who is a stranger to the contract purportedly interfered with."); *Williamson, Picket, Gross, Inc. v. 400 Park Ave. Co.*, 63 A.D.2d 880, 881, 405 N.Y.S.2d 709, 711 (1st Dep't 1978) (holding that a broker could not state a claim for tortious interference against a landlord on the basis of the landlord's efforts to prevent a sublessor from leasing to a sublessee, whom the plaintiff-broker represented, on the ground that "[i]f there was actionable interference it was directed against the proposed sublease, not the brokerage agreement"); *I.R.V. Merchandising Corp. v. Jay Ward Prods.*, 856 F.Supp. 168, 174 (S.D.N.Y.1994) ("As a matter of law, the relationship between [the plaintiff] and prospective licensees cannot be construed as the sort of contractual business relationship protected by the tort of interference with prospective economic advantage. [The plaintiff] has failed to allege any relationship with these licensees other than acting solely as the agent for [the defendant].").

Nevertheless, ITTC argues that its business is so intertwined with that of Kir-

---

**3.** Some courts have seen the "of and concerning" requirement as thereby serving a role in protecting freedom of speech and of the press. *See, e.g., Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 505–06 (D.C.Cir.1937); *Barger v. Playboy Enters.*, 564 F.Supp. 1151, 1153 (D.Cal.1983), *aff'd* 732 F.2d 163 (9th Cir. 1984); *Mich. United Conservation Clubs v. CBS News*, 485 F.Supp. 893, 900 (W.D.Mich. 1980), *aff'd*, 665 F.2d 110 (6th Cir.1981). *But see Emerito Estrada Rivera–Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24,

28 (1st Cir.2000) (explaining, in the course of a discussion of product disparagement law, why "there is reason to be cautious" about that approach).

**4.** The district court's use of the term "standing" in its decision appears to have created some confusion. As the parties now seem to agree, the issue is not constitutional standing under Article III, but whether ITTC has a cause of action under New York tort law.

chGroup that the defendants' conduct directly interfered with its business as well. It relies mainly on *Brown v. AXA RE.*, 2004 WL 941959, 2004 U.S. Dist. LEXIS 7624 (S.D.N.Y. May 3, 2004), and *TVT Records v. Island Def Jam Music Group*, 279 F.Supp.2d 366 (S.D.N.Y.2003), *rev'd on other grounds*, 412 F.3d 82 (2d Cir.2005). Both of these cases dealt with business relationships far closer than that between KirchGroup and ITTC. In *Brown*, the court concluded that even though their names did not appear on the face of the contract, two film producers who had negotiated with an insurance company to finance the production of their film had a cause of action for tortious interference against the insurance company for breaching the contract guaranteeing such financing. *Brown*, 2004 WL 941959, at *7, 2004 U.S. Dist. LEXIS 7624, at *20–*21. Similarly, in *TVT*, the court found that a wholly owned subsidiary of a company whose copyrights the defendants had infringed could pursue an action for tortious interference against the defendants. *TVT*, 279 F.Supp.2d at 383–84.

Here no such close relationship was alleged. ITTC does not assert that it is owned by KirchGroup or that the two companies share senior management. ITTC alleges only that it was known as the "face" of KirchGroup in North America and that it served as its "exclusive agent" in the United States. Am. Compl. ¶ 6. ITTC's alleged injury is thus derivative, resulting from the harm KirchGroup suffered. *See id.* ¶ 76 (alleging KirchGroup's insolvency caused ITTC to lose "virtually its entire business"). This is "too attenuated" to state a cause of action against the defendants. *See Kirch*, 2004 WL 2181383

at *8 n. 26, 2004 U.S. Dist. LEXIS 19228, at *33 n. 26.[5]

### C. Civil Conspiracy

■■ New York does not recognize an independent tort of conspiracy. See *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969, 503 N.E.2d 102, 102, 510 N.Y.S.2d 546, 547 (1986) (mem.) ("[A]s we long ago held, a mere conspiracy to commit a tort is never of itself a cause of action." (internal quotation marks and citation omitted; alteration incorporated)). Therefore, since ITTC fails to state causes of action for either of the torts underlying the alleged conspiracy, defamation or tortious interference with prospective economic advantage, it necessarily fails to state an actionable claim for civil conspiracy. The district court thus properly dismissed all of ITTC's claims.

### III. Tortious Interference with Contract

■ The plaintiffs other than ITTC argue that the defendants tortiously interfered with KirchGroup's contract with JP Morgan. Breuer's defamatory comments, they contend, created so much concern in the financial community about KirchGroup's financial stability that JP Morgan was forced to abandon Project Galaxy.

■ Under New York law, the elements of tortious interference with contract are (1) "the existence of a valid contract between the plaintiff and a third party"; (2) the "defendant's knowledge of the contract"; (3) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (4) "actual breach of the contract"; and (5) "damages resulting therefrom." *Lama Holding*

---

**5.** ITTC also argues that its status as a third-party beneficiary of the contracts with which defendants interfered provides it with a cause of action; but because the plaintiffs failed

adequately to plead that JP Morgan breached such a contract, *see infra* Part III, this argument is unavailing.

*Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 82 (1996).

The plaintiffs properly allege (1) the existence of a contract, and (2) the defendants' knowledge of that contract. See Am. Compl. ¶ 81 ("The KirchGroup had a contract with JP Morgan, of which the Defendants were aware, concerning the design and implementation of Project Galaxy."). The district court correctly determined, however, that the plaintiffs fail to allege the fourth element, actual breach. Instead, they contend only that JP Morgan "walked away, and Project Galaxy fell apart." *Id.* ¶ 70. Nowhere do they assert that JP Morgan actually breached its contract with KirchGroup.[6]

Perhaps because they were aware of this deficiency, the plaintiffs argued in the district court that "actual breach" was not required to sustain a tortious interference with contract claim. They do not press this argument on appeal. Kirch Br. at 52. Instead, they insist that the reasonable inferences drawn from such phrases as "abandoned" and "walked away" are sufficient to sustain the action. *Id.*

We disagree. The inference we draw from the plaintiffs' allegation that JP Morgan "walked away" from Project Galaxy is that the investment bank decided not to proceed with the project. This does not amount to an allegation that JP Morgan violated the terms of a contract with KirchGroup when it did so. Reading the complaint in the light most favorable to the plaintiffs, as we must, the plaintiffs have failed to plead a required element for tortious interference with contract.

## IV. Defamation Claims of Plaintiffs other than ITTC and Tortious Interference with Prospective Advantage Claims

■■■ Relying on *Celle v. Filipino Reporter Enterprises Inc.,* 209 F.3d 163, 178 (2d Cir.2000), and *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 289, 501 N.E.2d 550, 552, 508 N.Y.S.2d 901, 903 (1986), the district court observed that "New York law absolutely protects statements of 'pure opinion,' such that they can never be defamatory," *Kirch,* 2004 WL 2181383, at *6, 2004 U.S. Dist. LEXIS 19228, at *20. The district court applied the test developed in *Ollman v. Evans,* 750 F.2d 970, 983 (D.C.Cir.1984) (en banc), adopted as New York law in *Steinhilber,* 68 N.Y.2d at 292, 501 N.E.2d at 554, 508 N.Y.S.2d at 905, for distinguishing statements of fact from those of opinion.[7] It concluded that in light of "the full context of the communication in which the statement appears," Breuer's comments constituted non-actionable opinion, rather than an actionable

---

**6.** Having failed sufficiently to allege actual breach, it follows that the plaintiffs have not alleged facts sufficient to fulfill third element, procurement of the third-party's breach of the contract without justification.

**7.** Although the parties disagree as to its precise wording, all agree that *Steinhilber* and *Ollman* correctly frame the relevant inquiry, under which whether a communication is "opinion" or "fact" depends on:

(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determina-tion of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'

*Steinhilber,* 68 N.Y.2d at 292, 501 N.E.2d at 554, 508 N.Y.S.2d at 905–06 (quoting *Ollman,* 750 F.2d at 983).

statement of fact. *Kirch,* 2004 WL 2181383, at \*6, 2004 U.S. Dist. LEXIS 19228, at \*20–\*21 (internal quotation marks and citation omitted). In support of this view, the court noted Breuer's prefacing of his remarks with such phrases as "I believe," "I'd say," and "I hope." *Id.* (internal quotation marks omitted). Responding to the plaintiffs' suggestion that Breuer's answer to the reporter's question as to whether someone would help KirchGroup "carry on" was a "mixed opinion," implicitly based on facts justifying its assertion, the court noted that Breuer specifically qualified his response with the phrase, "all that you can hear or read about." 2004 WL 2181383, at \*6, 2004 U.S. Dist. LEXIS 19228, at \*21 (internal quotation marks omitted).

Although the court's conclusion is plausible, we are reluctant to decide unnecessarily whether it was correct. The allegedly defamatory statement is presented to us in the form of an English translation of an interview conducted in German, couched in tentative and nuanced phrases, about events primarily affecting the German media and German persons and entities, and disseminated initially—and in large part—to an audience of German bankers and financiers. Under the law applicable here, we would be required to determine the meaning of the statement in " 'the sense in which the words were likely to be understood by the ordinary and average reader.' " *James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837–38, 386 N.Y.S.2d 871, 874 (1976) (quoting *Mencher v. Chesley,* 297 N.Y. 94, 100, 75 N.E.2d 257, 259 (1947)); *see also Rudin v. Dow Jones & Co.,* 557 F.Supp. 535, 537 (S.D.N.Y.1983) (indicating that it is the meaning the statement would have to the particular audience at which it was aimed that controls).

It would be difficult indeed for us to determine precisely what the German language statement at issue here meant in the sense in which it was likely to have been understood by the ordinary and average audience member at which the televised interview was aimed. *See Rudin,* 557 F.Supp. at 537; *Gannett,* 40 N.Y.2d at 419, 353 N.E.2d at 837–38, 386 N.Y.S.2d at 874. Nor is it clear how we could tell whether the German language statement conveyed what would be understood to be a statement of opinion or to be an assertion of fact.

The parties dispute the proper translation of Breuer's words. In his brief, Kirch asserts that Breuer's "use of the term 'you' [in the phrase "all that you can hear and read about"] rather than 'I' is somewhat dissembling in being more general than just Breuer." Kirch Br. at 32. The defendants respond by pointing out that the German pronoun "man" is a third person impersonal pronoun more analogous to "anyone" than to "you." Deutsch Bank Br. at 22–24. According to the Deutsche Bank defendants, this makes even clearer the fact that Breuer was basing his comments on *public* knowledge. Without more than we have, though, it is hard for us to make a sound judgment as to which is the proper nuance of the German phrase.

We do not mean to suggest that we *cannot* decide the defamation issue. Cases are routinely brought to American courts even though the evidence about relevant occurrences or transactions is in a foreign language. Indeed, we have dealt with at least one defamation case requiring translation. In *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 226, 229 (2d Cir.1985), we determined that a French language review of a New York restaurant was a statement of opinion under the *Ollman* analysis. Since we do not

think it necessary for us to do so in this case—at least at this time—and since this is a case in which the meaning of certain words is at the core of our inquiry, we think it the better course not to make such a determination now.[8]

■■■ The defendants in effect argued as much in the district court. Their motion to dismiss was based primarily on *forum non conveniens* and res judicata grounds, not on the actionability under New York law of Breuer's statements translated into English. But the district court declined to rule on that part of their motion. The court did not ignore the *forum non conveniens* issue entirely, however. It noted:

> without deciding the issue that, even if the Complaint did state a claim upon which relief could be granted, this action would likely be dismissed on forum non conveniens grounds. As explained ... ITTC must be dismissed for lack of standing. With ITTC properly removed, this case, the majority of whose events, people and documents exist in or concern Germany, probably lacks the requisite connection to the United States to be maintained here.

*Kirch,* 2004 WL 2181383, at *11 n. 31, 2004 U.S. Dist. LEXIS 19228, at *40 n. 31. In light of the foregoing discussion, and in view of our conclusion that the district court correctly dismissed all of ITTC's claims, we further conclude that the court should decide the issue of *forum non conveniens*. We therefore vacate the court's judgment and remand for it to make that determination. The court is free also to address the issue of res judicata if it deems that to be appropriate.

Because Kirch's tortious interference with prospective economic advantage and civil conspiracy claims largely depend on his defamation claim, we similarly vacate the district court's judgment with respect to those claims and remand that portion of the case to the district court.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment with respect to Kirch's tortious interference with contract claim and all of ITTC's claims; we vacate the district court's judgment as to the plaintiffs' remaining claims of defamation, tortious interference with prospective economic advantage, and civil conspiracy; and we remand with instructions to the district court to decide, within forty-five days after the completion of such additional briefing and other submissions by the parties as the district court may order or otherwise request or require, the issues of forum *non conveniens* and, in its discretion, res judicata for the remaining claims.

In the interests of judicial economy and expeditious resolution of these claims, we direct the Clerk of this Court to refer any appeal from the district court's further orders or judgments in this case to this panel. See *United States v. Jacobson,* 15 F.3d 19, 22 (1994).

---

8. In *Mr. Chow,* we noted in addressing the English version of the French review that the plaintiff's expert, "Dr. Joseph, a professor of French language and literature at Smith College, testified that he had translated the French version of the review into the English version. He also gave testimony concerning the accuracy of his translation of the phrase 'the green peppers ... remained still frozen on the plate.'" *Id.* at 222.