ADVANCED MARKETING GROUP,
INC., Plaintiff,

v.

BUSINESS PAYMENT SYSTEMS,
LLC, Defendant.

No. 05 Civ. 9212(VM).

United States District Court,
S.D. New York.

March 30, 2007.

---

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Advanced Marketing Group, Inc. ("AMG") filed a complaint (the "Com-

plaint") against defendant Business Payment Systems, LLC ("BPS"), alleging breach of contract because of a unilateral reduction and eventual elimination in fees paid to AMG by BPS for services connected to credit card payment processing services. BPS in turn filed a motion (the "Motion") to dismiss the Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). For the reasons discussed below, the Motion is GRANTED.

## I. BACKGROUND[1]

AMG is an independent sales organization ("ISO") that markets and sells payment processing services[2] to merchants throughout the United States. BPS performs similar services, but also recruits sales agents and sales offices ("sub-ISOs") to seek merchants on its behalf for credit card processing services. National Processing Company ("NPC") is a company that provides the actual payment processing services for which AMG and BPS solicit merchants. Although companies such as AMG and BPS recruit potential merchants, those merchants contract directly with NPC for services. The ISOs and the sub-ISOs then receive a portion of the residuals from each credit card transaction.

### A. THE JUNE 2001 AGREEMENT

Pursuant to a Marketing Agreement and Addendum signed by AMG and BPS on June 7, 2001 and June 11, 2001 (the "June 2001 Agreement") respectively, BPS engaged the services of AMG to canvas the marketplace in search of potential merchants. The June 2001 Agreement included the following relevant clauses:

2. *Obligations of AMG*

2.1 On an exclusive basis, AMG, it's [*sic*] officers, directors, employees and agents will use their best efforts to solicit prospective Merchants to execute Merchant Systems Agreements with BPS....

 * * * * * *

5. *Fees Payable to AMG.* BPS agrees to pay AMG Residuals in accordance with the pricing set forth on Schedule B as may be amended from time to time provided that: (a) Merchant continues to process through BPS; (b) AMG has not been terminated by Processor or Bank for cause; and, (c) all monies owed to BPS and Processor by AMG are paid as agreed.

 * * * * * *

6. *Recourse.* AMG acknowledges and agrees that BPS shall have full recourse against AMG for: (a) any residuals previously paid on any Transaction which is subsequently charge [*sic*] back (b) monies owed by AMG to BPS, Processor, Bank for any reason, including but not limited to equipment, sales, supplies, and/or marketing materials, or (c) any errors or inaccuracies in amounts previously paid to AMG under the Agreement. AMG further agrees such recourse shall not be limited to withholding Residuals, but at BPS [*sic*] sole discretion BPS

---

**1.** The factual recitation and contentions set forth below derive from the Complaint, dated October 24, 2005, the Affidavit of Michael Weiner in Opposition to the Motion to Dismiss, dated August 11, 2006 ("Weiner Aff."), and the Memorandum in Opposition to Defendant's Motion to Dismiss, dated August 11, 2006 ("Pl.'s Mem.").

**2.** Payment processing services are business services including credit card processing, debit card processing, and check processing. (Compl. ¶ 15.) In comparison, BPS sells and markets only credit card processing services.

may initiate other actions to recover such monies.

\*　　\*　　\*　　\*　　\*　　\*

11. *Term, Termination and Renewal*

11.2　BPS shall have the right to immediately terminate this Agreement by written notice to AMG upon the occurrence of any of the following:

(a) Breach of this Agreement by AMG

(b) Breach of any Rule by AMG

(c) AMG or any of its officers, directors, agents or employees is employed in practices that involve elements of fraud or conduct BPS deems to be potentially injurious to BPS. . . .

\*　　\*　　\*　　\*　　\*　　\*

16. *Confidentiality*

16.1　AMG expressly acknowledges that the data and other information (collectively, "Information") to which AMG and its employees and agents have access in connection with the negotiation, performance and administration of this Agreement has commercial value and is proprietary to BPS, Processor and/or Bank.

16.2　AMG hereby agrees to keep all information confidential and to not disclose any information to any person. . . .

\*　　\*　　\*　　\*　　\*　　\*

18. *Notices.* All notices and other communications required or permitted under this Agreement shall be in writing and given by personal delivery, telecopy (confirmed by a mailed copy) or first-class mail, postage prepaid. . . .

\*　　\*　　\*　　\*　　\*　　\*

Schedule B

AMG is to receive 50 percent of all residuals generated from ongoing business on a monthly basis from accounts placed with BPS. AMG is to receive 50% of net income generated from all equipment sales. These residuals will be paid on a lifetime basis to AMG, as long as the merchant continues to process through BPS.

Addendum

AMG will receive monthly residuals of 50% override on all retail and Mail Order Accounts that are submitted and processing with NPC. AMG will receive all residual streams funded by NPC to BPS. In addition, a commission of 50% & 10% override will be paid on all installed equipment deals sold by AMG representatives.

*E–Commerce:* AMG will be entitled to a 50% revenue sharing from residuals on any Internet account. AMG will be entitled to a 50% revenue sharing from any profit received from the sale of software. In addition, AMG will be entitled to a 50% revenue sharing on revenues generated with the BPS Merchant E–Commerce package. There will be no overrides generated from Internet accounts.

(*June 2001 Agreement,* attached as Ex. A of Weiner Aff.)

B. *THE MAY 2002 ADDENDUM*

On May 16, 2002, AMG and BPS amended and modified the June 2001 Agreement by executing a second and final Addendum to Contract (the "May 2002 Addendum"). The May 2002 Addendum included the following relevant clauses:

4. BPS Agrees to pay Advanced Marketing Group, Inc. 75% of revenues received by BPS including all monies received on equipment and all monies received on residuals.

5. Advanced Marketing Group, Inc. Agrees to supply BPS with 100 accounts monthly on or about January

2003 and 200 accounts on or about January 2004.

8. Advanced Marketing Group, Inc. and Business Payment Systems will share equally in all profits generated from the high-risk business current and future.

(*May 2002 Addendum*, attached as Ex. B of Weiner Aff.)

## C. *FACTUAL ALLEGATIONS*

In the Complaint, AMG alleges that BPS unilaterally reduced AMG's share of residuals from 75 percent, as agreed upon in the May 2002 Addendum, to 60 percent in May 2004 and to 55 percent the following month. AMG claims that it continued to meet production requirements as established in the May 2002 Addendum because it provided BPS with an average of 92 new accounts for the year 2003 and supplied BPS with 304 accounts between January and March 2004.

AMG also claims that it continued to pay half of its share of profits generated from high-risk accounts as required by the May 2002 Addendum. AMG alleges, however, that it was forced to reallocate monies generated from the high-risk accounts to pay BPS agents and sub-ISOs after BPS failed to pay residuals to AMG. As a result, AMG claims it had no profits to share with BPS after July 2004. AMG alleges that neither the June 2001 Agreement nor the May 2002 Addendum permitted BPS to withhold residuals or terminate the June 2001 Agreement in its entirety.

Lastly, AMG entered into a contract with Maximum Research ("MR"), under which MR agreed to act as a sub-ISO for AMG. AMG, in turn, provided the MR customers to BPS. AMG claims that, pursuant to the May 2002 Addendum, it should receive 75 percent of the residuals earned from the customers procured by MR. AMG alleges that, as of June 2003, BPS stopped paying residuals earned on the MR accounts to AMG, and, instead, paid those residuals directly to MR, thus preventing AMG from obtaining its share of the residuals.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999). The appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998). On a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all well-pleaded factual assertions in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir.2000). In deciding the motions, the Court may consider documents referenced in the complaint and documents that are in the possession or that the plaintiff knew of and relied on in bringing the suit. *See Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993).

### B. *BREACH OF CONTRACT CLAIM BASED ON BPS DECISION TO ELIMINATE RESIDUALS*

■ BPS argues that AMG's breach of contract claim related to the withholding of residuals must be dismissed because it rightfully terminated the Agreement after AMG's failure to meet the production targets specified in the May 2002 Addendum. AMG counters that it met those targets; that the residuals at issue were to paid "on a lifetime basis"; and that, regardless, the language of the June 2001 Agreement re-

quires that BPS provide written notice prior to termination.

 To state a claim in federal court for breach of contract under New York law, a plaintiff need only allege (1) the existence of an agreement; (2) the performance of the contract by plaintiff; (3) breach of the agreement by defendant; and (4) damages. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). Here, the parties disagree as to whether AMG adequately performed pursuant to the terms in the May 2002 Addendum.

As indicated above, the language of the May 2002 Addendum required AMG to provide BPS "with 100 accounts monthly on or about January 2003 and 200 accounts on or about January 2004." (*May 2002 Addendum*, Weiner Aff., Ex. C.) AMG offers production figures indicating that a total of 1,104 new accounts were generated from January 2003 to December 2003, averaging 92 new accounts per month. (*See* Weiner Aff., ¶ 29(c).) The wording of the Addendum, however, clearly indicates that AMG agreed to provide BPS with "100 accounts monthly." The Court construes this term to mean *each month* and finds nothing in the contract that makes reference to determining the number of new accounts opened by averaging the annual number of accounts provided. The numbers offered by AMG itself indicate that AMG failed to meet the goal of providing BPS with 100 accounts each month during eight out of twelve months in 2003.[3] (*See*

*id.*) In failing to meet the production targets as specified in the Addendum, AMG, by way of its own statistics, did not comply with the agreement and therefore did not sufficiently plead the element of adequate performance required to state a claim for breach of contract.

Moreover, AMG failed to meet the second requirement of this section of the Addendum in that it did not provide BPS with "200 accounts as of January 2004." Here, there is no reference to any month other the January 2004, making AMG's reference to the following months irrelevant. AMG's own figures indicate that it provided BPS with only eighty-one new accounts as of January 2004. (*See id.*, ¶ 29(d).)

AMG's response is that it was required only to "continue its best efforts" to solicit prospective merchants, pursuant to the language in Section 2.1 of the June 2001 Agreement. (*See* Def.'s Mem. in Supp. Mot. Dismiss, dated May 26, 2006, ("Def.'s Mem.") at 8.) In other words, AMG argues that it was not required to meet the targets set forth in the May 2002 Addendum, but only to try its best to do so. There is no merit in this contention.

 A contract which appears complete on its face is an integrated agreement as a matter of law. *See Battery S.S. Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 738 n. 3 (2d Cir.1975). The June 2001 Agreement includes the negotiated May 2002

---

3. There is some dispute between the parties as to whether the figures offered by AMG are accurate. BPS argues that those figures are misleading because the accounts cited by AMG were also supplied to the direct competitors of BPS, rather having been provided exclusively to BPS as it claims is required pursuant to Section 2.1 of the June 2001 Agreement, and because some of the accounts referenced were never actually placed with BPS. (*See* Def.'s Reply Mem. in Supp. Mot. Dismiss, dated November 20, 2006, ("Def.'s

Reply Mem.") at 4–5.) Such an inquiry is unnecessary since, as BPS notes, even if AMG's accounting is accurate, AMG still did not achieve the number of accounts agreed upon in the May 2002 Addendum. AMG avers that it opened 88, 83, and 67 accounts for the months of March, April, and May of 2003 respectively; it opened 62 and 67 for the months of July and August of 2003; finally, it opened 78, 74, and 78 for the months of October, November, and December of 2003. (*See* Weiner Aff., ¶ 29(c).)

Addendum, as both parties concur. (*See* Pl.'s Mem. at 14; Def.'s Mem. at 14). The Addendum clearly sets forth specific numerical targets that AMG agreed to meet. After setting these targets, AMG, in essence, sharpened its definition of "best efforts" and linked those efforts to particular goals, delineated by the language of the Addendum. AMG did not meet these standards and therefore did not comply with the terms of the contract. Thus, AMG has failed to plead the adequate performance element required to establish a claim of breach of contract.

It is true that BPS did not comply with the process for terminating the Agreement pursuant to Section 11 of the Agreement, which details BPS's "right to immediately terminate this Agreement *by written notice* to AMG" upon breach of the Agreement by AMG. (*June 2001 Agreement*, Ex. A of Weiner Aff., ¶ 11.2)(emphasis added). The only written notice that BPS points to as a possible indicator of its intent to terminate the Agreement is a letter from its legal counsel dated August 11, 2004. (*See* Letter from Eric Linden to Jerry Wong, dated August 11, 2004, ("August 2004 Letter"), attached as Ex. C of Weiner Aff.) The August 2004 Letter, however, is unrelated to AMG's failure to meet production targets and focuses on AMG's alleged failure to solicit merchants for BPS "on an exclusive basis." (*Id.*) The content of the letter indicates neither a reference to the failure of AMG to meet production targets, nor does it declare that BPS was, in fact, terminating the Agreement for the reasons listed in the letter. This fact, demonstrating a breach of the June 2001 Agreement by BPS, does not, however, do

away with AMG's requirement to state facts sufficient to plead adequate performance as to its required conduct.[4] Accordingly, BPS's Motion is granted with respect to the breach of contract claim.

### C. *TORTIOUS INTERFERENCE CLAIM*

■ AMG's second cause of action relates to an alleged contract between AMG and MR, a sub-ISO of AMG. AMG claims that MR agreed to act as AMG's sub-agent and procured customers for AMG. AMG also claims that it provided the MR customers to BPS and, as a result, is owed 75 percent of the residuals earned by the MR customers. AMG alleges that BPS stopped paying residuals on the MR customers in or about June 2003. (*Compl.* ¶¶ 30–33.)

■ Under New York law, the elements of tortious interference with a contract are: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401 (2d Cir.2006)(*quoting Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (N.Y. 1996)).

The Complaint clearly states the existence of a valid contract between AMG and MR and estimates monetary damages. (*See* Compl. ¶¶ 29, 34.) It provides no

---

**4.** BPS makes two other claims regarding whether AMG adequately performed under the Agreement. In short, they allege that AMG neither paid its 50 percent share of profits generated from high-risk accounts, nor complied with the confidentiality terms of the agreement pursuant to Section 16 of the June 2001 Agreement. (*See* Def.'s Mem. at 9–13.) BPS's arguments for both issues are less clear-cut and would require a further developed record for the Court to determine whether AMG satisfied the terms of the Agreement with respect to these claims.

detail, however, as to BPS's knowledge of the AMG and MR contract, nor does it allege that MR itself actually breached the contract.[5] Instead, it alleges only a breach by BPS. (*See id.* ¶ 34.) The Complaint is also silent as to BPS's alleged willful and intentional procurement of MR's contract. Without greater detail in the Complaint, the Court must dismiss the tortious interference claim at this time. Thus, BPS's Motion is granted with respect to the tortious interference claim.

### III. ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Docket No. 8) of defendant BUSINESS PAYMENT SYSTEMS, LLC to dismiss the complaint of plaintiff ADVANCED MARKETING GROUP, INC. ("AMG") herein is GRANTED with respect to all claims pled herein by AMG.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

---

**5.** The only paragraph of the Complaint that refers to wrongful conduct on the part of BPS with respect to the MR conduct states, "In or about June 2003, BPS stopped paying residuals earned on the MR Customers to AMG and, instead, paid those residuals directly to MR, thus preventing AMG from obtaining its share of residuals." (Compl.¶ 34.) AMG likely has only a few steps to make from this statement to one that might sufficiently plead tortious interference, but AMG must make those allegations explicit to show that it is entitled to relief from the Court.